[No. 40197.    Department Two.    July 17, 1969.]

HOMER R. HOUSE et al., Respondents, v. RAY THORNTON et al., Appellants.*

John L. Vogel, for appellants.

Clinton, Moats, Andersen & Fleck and Gordon S. Clinton, for respondents.

HALE, J.—Fraud is so easy to claim that the law makes it hard to prove. When the basement, walls, floors and foundation of a house plaintiffs had bought from defendants slipped and cracked and the supporting terrain slid away from the foundation, plaintiffs brought this suit to rescind the sale. Plaintiffs Homer and Noreen House charged the sellers with overt false misrepresentations and deceit but the court granted the rescission although expressly finding that these allegations were not clearly, cogently and con-

*Reported in 457 P.2d 199.

vincingly proved. Defendant sellers appeal, and we perceive the major issue to be whether, in the sale of a brand-new house to its first buyer and occupant, the law impresses the transaction with a warranty that the foundation is firm and secure.

Defendant Headley, a real-estate broker, in 1961, bought lots 7, 8 and 9 in block 3, on 57th Avenue Northeast in Seattle. He built and sold a house on lot 7, kept lot 8, and arranged with his building contractor, defendant Ray Thornton, to build and sell a house on lot 9 to a young doctor who subsequently withdrew from the deal. Before buying the lots, Headley had discovered on lot 9 the foundation of a house that had once been there. The vendor told him that the house had been removed from the lot because septic tanks on adjacent higher ground had drained onto it, and the drainage from them had impaired the stability of the earth there. The owner also told him that the removed house and the remaining foundation had been improperly constructed and the lot improperly drained, but that the lot had never been filled and that the area had never been considered a slide area.

Headley checked with the city engineer's office, found that the land on lot 9, although on a fairly steep slope, was considered to be stabilized; that there had been no contrary indication for 15 years; and that the septic tanks once thought to have been the source of the slides were now disconnected and a city sewer installed in their stead. According to Headley's builder, Thornton, the old foundation had been an amateurish job of construction with improper and inadequate use of steel and badly poured concrete, and was altogether unsuitable for hillside construction. Discovery of the foundation thus did not amount to warning or indication that the lot and subsoil would prove to be unstable for a new foundation properly designed and built.

Defendant Headley and his contracting builder entered into a copartnership and agreement to construct a residence on lot 9 for a young doctor who agreed to purchase it. After construction had been well under way, the prospective purchaser withdrew from the transaction on the basis that his

immediate future income potential did not warrant so great an investment. Nevertheless, the defendants proceeded with their plans to finish the residence and to advertise it for sale.

Homer and Noreen House, plaintiffs, first saw the house in August, 1964. At the time, it was virtually complete and the upstairs was ready for occupancy but some partitions and plasterboard had yet to be installed in the basement. Landscaping was largely uncompleted. Plaintiffs noticed ruts and crevices in the rockery and ditches in the backyard apparently caused by erosion. A few weeks later, in September, 1964, they bought the house and lot 9 plus an adjoining 10 feet on lot 10 for $32,583.38, making a down payment of $12,583.38 and financing the $20,000 balance through a mortgage with the University Federal Savings and Loan Association.

About 3 months later, in December, 1964, following a period of heavy rains, the Houses observed a three-eighths inch crack open up in the earth outside of but running the length of and parallel to the east wall of the house and on into the adjacent lot. Water accumulated in the yard, and Mr. House, on the advice of Mr. Thornton, the builder, dug a trench to drain it. In digging this trench, Mr. House first discovered the existence of the old foundation.

During the following winter, 1965, another crack in the yard opened up and Mr. House dug another trench to drain the water away from it and found that the earth beneath it settled for about 3 inches near the north end of the house. Then the steps and basement wall separated, and the seam between the chimney and house opened so that daylight showed through it into the living room. Earth supporting the end of the concrete patio dropped 4 to 6 inches and the walkway to the patio separated 4 to 5 inches for a distance of 20 feet. Mr. Thornton brought in a machine, cracked up and removed the patio, and discovered that the east wall of the basement had bulged. A crack developed in the basement floor running up into a section of the concrete basement wall. The floor of the basement dropped about 6 inches and another crack opened up in the basement wall.

Nearly all of the doors in the house settled and had to be planed but finally the shifting of the house made the planing futile. Cracks developed in the plasterboard of the kitchen, hallway, stairwell and bedroom. Thornton, the builder, treated the yard soil and rockery with plastic sheeting to reduce moisture content of the subsoil, separated the drain tile from the downspouts, and connected fire hose to lead the water away from the basement.

But the crack in the yard running parallel to the east side of the house widened to 4 to 6 inches and deepened to nearly 3 feet in places. Cracks in the basement walls continued to widen and deepen, and at one place near a basement window a wide, jagged, open crack appeared which would leave doubts that the house was safe for occupancy. Pictures of the place showed long, jagged cracks in the yard, and the earth sluffing away from under the foundation. Cracks appeared in the concrete basement walls which formed part of the foundation. There was little doubt among the parties that, after 23 months of occupancy and continuous efforts to remedy the slipping and cracking, the house was untenable and unfit for further occupancy as a dwelling.

Plaintiffs brought this suit for rescission. The trial court granted a decree rescinding the sale on tender of a deed by plaintiffs to the defendants, awarded plaintiffs judgment in the sum of $11,685.69, and ordered the defendants to hold plaintiffs harmless from any further liability on the mortgage. In allowing plaintiffs rescission and arriving at damages of $11,685.69 for moneys paid in and expended by them, the court deducted from their award a reasonable rental for their occupancy fixed at $200 per month for 39 months, or a total reduction in the judgment of $7,800.

Plaintiffs, as earlier stated, brought this suit for rescission on the basis of deceit and misrepresentation concerning the stability of the house, lot and surrounding terrain. They testified that the appearance of the lot and slope on which the house rested and the appearance of the higher surrounding terrain and that of the rockery and patio prompted them to make inquiries of the defendant sellers

before completing the purchase as to the security of the lot. They said the defendants assured them that there would be no problems as to the hill on which the house stood, that sewers had been installed to replace the old septic tanks in the area, and that, if there had been any problems of slides, the trees in the vicinity would have shown it. Defendants, they said, pointed to some standing trees and piling, all completely erect, which they said would have been leaning had there been slippage.

The vendor-builders made no reference to the removal of a house from lot 9 nor that its foundation remained there, and the plaintiff-buyers were unaware of either. Plaintiffs did not learn of the removal of the house nor its remaining foundation until long after they had moved in and had attempted to drain the lot. Plaintiffs thus based their suit for rescission mainly on a claim of fraud through misleading and deceptive statements but relied, too, on the fact that defendants knew there had been a residence on the property and that it had been removed because of the instability of the foundation, and urged that a failure to divulge this information to a prospective purchaser amounted to the fraudulent withholding of material information which the seller had a duty to divulge.

The trial court granted plaintiffs a decree of rescission but not on the main grounds of false and misleading representations. It categorically exonerated defendants of overt misrepresentation and deceit in an express finding that there was insufficient proof of positive, fraudulent misstatements and that no fraudulent misstatements were "established by clear, cogent and convincing evidence." Further obviating the idea of fraud, the court found that the defendants "believed that the foundations which had been established for the house . . . were adequate to support it," and that "defendants Thornton took all the steps they felt were necessary to comply with a difficult soil situation." The court found, too, that the defendants knew there had been a house on the same lot and that, because of "some type of earth movement, the concrete foundation had cracked and the house had to be removed."

Again, in summarizing the case in an oral opinion, the court categorically stated that its judgment was not to be based on concepts of fraud and deceit.[1] Finally, to make it clear that actionable fraud and deceit were not the basis for the relief granted, the trial judge, favoring the record with a memorandum opinion, said:

Plaintiffs alleged fraud as grounds for their requested rescission. However, the Court found, after the presentation of all the evidence, that the plaintiffs had failed to sustain their burden to prove by clear, convincing and cogent evidence that any affirmative misrepresentation had been made to Mr. House concerning the soil stability.

Rescission was thus granted and judgment awarded the buyers, as we understand the learned judge's opinion, on the basis that the defendants knew of the earlier soil slippage and removal of the house some 15 years earlier from lot 9; that this possible instability would not be evident to a purchaser even on careful examination unless he were a soil expert; and that this knowledge, even though the vendor conscientiously and for good reason believed the foundation and soil to be firm and secure, gave rise to a duty to disclose it to the buyer. The failure to make such a disclosure, concluded the trial court, engendered the same right to rescission in this case as would actionable fraud and deceit.

■ Fraud and deceit, being so easy to assert, must be proved by clear, cogent and convincing evidence. *Baertschi v. Jordan,* 68 Wn.2d 478, 413 P.2d 657 (1966); *Williams v. Joslin,* 65 Wn.2d 696, 399 P.2d 308 (1965); *Swanson v. Solomon,* 50 Wn.2d 825, 314 P.2d 655 (1957). Despite the

---

[1]"I frankly have been impressed with both sets of clients in this case. I have been impressed with Mr. House and I have also been impressed with the Thorntons. I was thinking this afternoon if I had a house to build, I am not sure I wouldn't call Mr. Thornton at some stage and let him take a look at it. I am impressed with his conscientiousness in approaching the problems in this house. I have been impressed with Mr. House's attempt to recollect what happened in the case.

"I feel in stating it very summarily that the proof of positive fraudulent misstatements on the part of the Headleys and the Thorntons has not been made by clear, cogent and convincing evidence."

absence of actionable fraud, deceit and misrepresentation, however, we think that the trial court reached the right conclusion. Our reasons differ in some degree from those of the trial court although it should be said that the doctrines upon which we affirm have not, we think, been heretofore squarely stated in this jurisdiction in cases arising from the sale and purchase of realty.

In two cases, the issues concerning the sale of or construction upon real estate have approached, but not quite reached, the determinative issues now before us. *Hoye v. Century Builders, Inc.,* 52 Wn.2d 830, 329 P.2d 474 (1958), held that when a contractor undertook to construct a house for and upon the land of another, there was an implied warranty that the house would be fit for human habitation. In *Fain v. Nelson,* 57 Wn.2d 217, 356 P.2d 302 (1960), we again held that, where a building is sold in the course of construction, there can be an implied warranty that on completion it will be fit for the intended purpose, but that a defective but reparable roof was not such a fatal defect or deficiency as to vitiate the contract since it did not render the building unfit for its intended purpose and did not amount to a breach of the implied warranty.

The rule of implied warranty of fitness covering new construction or the sale of a partially constructed building, although closely related to the sale of a brand-new residence, falls short of meeting the precise issues in the instant case. Frequently, the prospective purchaser of a house buys it with knowledge of its defects and makes no point whatever of their existence before consummating the deal; and if the defects or deficiencies or conditions do not render the house unfit for habitation, the question of whether an implied warranty covers them could be said to depend on whether they are of such magnitude as to prevent the house from being used for the purpose for which it was purchased. *See Fain v. Nelson, supra.* But the present trend is toward the implied warranty of fitness and away from caveat emptor when it comes to the things which vitally affect the structural stability or preclude the occupancy of the building.

██ Nothing, of course, can be said to be more vital to a dwelling than the stability of its foundation. When the foundation of a house cracks, slips, shifts or deteriorates to such an extent that a person of reasonable prudence would reasonably assume that the house is unsafe for occupancy, it is no longer fit for its intended purpose, *i.e.*, a place of residence for the owner and his family. This, of course, is true whether the danger arises from instability of the land and terrain on which the foundation rests or from defects in the foundation's design, installation, fabrication or composition. There can be little doubt that the house which plaintiffs bought from the defendants met this test of unsuitability. The evidence amply supported the court's conclusion that the sliding, slipping, and cracking of the foundation and floors, and the cracking and shifting of the walls, although due not to faulty design, installation or workmanship but rather to the instability of the ground and terrain upon which the house stood, rendered the premises unusable as a dwelling.

Although the court found that the defendants were free of fraud and misrepresentation, and there was no proof that the defendants failed to properly design and erect the building, or that they used defective materials or in any respect did an unworkmanlike job, and that they were innocent of any intentional wrong, the fact remains that they sold and turned over to plaintiffs a brand-new $32,000 residence which turned out to be unfit for occupancy. As between vendor and purchaser, the builder-vendors, even though exercising reasonable care to construct a sound building, had by far the better opportunity to examine the stability of the site and to determine the kind of foundation to install. Although hindsight, it is frequently said, is 20-20 and defendants used reasonable prudence in selecting the site and designing and constructing the building, their position throughout the process of selection, planning and construction was markedly superior to that of their first purchaser-occupant. To borrow an idea from equity, of the innocent parties who suffered, it was the builder-vendor who made the harm possible. If there is a comparative

standard of innocence, as well as of culpability, the defendants who built and sold the house were less innocent and more culpable than the wholly innocent and unsuspecting buyer. Thus, the old rule of caveat emptor has little relevance to the sale of a brand-new house by a vendor-builder to a first buyer for purposes of occupancy.

We apprehend it to be the rule that, when a vendor-builder sells a new house to its first intended occupant, he impliedly warrants that the foundations supporting it are firm and secure and that the house is structurally safe for the buyer's intended purpose of living in it. Current literature on the subject overwhelmingly supports this idea of an implied warranty of fitness in the sale of new houses. *See Property-Implied Warranty of Fitness in the Sale of a New House,* 71 W.Va. L. Rev. 87 (1968); *The Case of the Unwary Home Buyers: The Housing Merchant Did It,* 52 Cornell L. Q. 835 (1967); *Caveat Emptor in Sales of Realty—Recent Assaults Upon the Rule,* 14 Vand. L. Rev. 541, (1961); *The Case For an Implied Warranty of Quality in Sales of Real Property,* 53 Geo. L. J. 633 (1965). *See, also,* 43 Den. L. Rev. 379 (1966); 26 U. Pitt L. Rev. 862 (1965); 44 N.C. L. Rev. 236 (1965); 1 Cal. West. L. Rev. 110 (1965).

Other jurisdictions have imposed an implied warranty of fitness upon the vendor-builder of a new house. *Waggoner v. Midwestern Dev., Inc.,* 154 N.W. 2d 803 (S.D. 1967); *Schipper v. Levitt & Sons, Inc.,* 44 N.J. 70, 207 A.2d 314 (1965); *Carpenter v. Donohoe,* 154 Colo. 78, 388 P.2d 399 (1964); *Bethlahmy v. Bechtel,* 91 Ida. 55, 415 P.2d 698 (1966).

Affirmed.

HUNTER, C. J., HILL and ROSELLINI, JJ., and ARMSTRONG, J. Pro Tem., concur.