LOCH HILL CONSTRUCTION COMPANY, INC. *v.*
HOWARD R. FRICKE ET AL.

[No. 71, September Term, 1978.]

*Decided April 10, 1979.*

*Edward C. Covahey, Jr.* and *Mark S. Devan,* with whom were *Covahey & Boozer* on the brief, for appellant.

*Joseph C. Wich, Jr.,* with whom were *Cook, Howard, Downes & Tracy* on the brief, for appellees Howard R. and Sharon L. Fricke, and *William A. Hahn, Jr.,* on the brief for appellee G. Edgar Harr Sons' Corporation.

DIGGES, J., delivered the opinion of the Court.

Having discovered through harsh experience the truth in Poor Richard's observation that "[w]hen the well's dry, we know the worth of water," B. Franklin, *Poor Richard's Almanac* (1746), Howard R. and Sharon L. Fricke, respondents here, instituted this action in the District Court of Maryland to recover from petitioner Loch Hill Construction Company, Inc., the cost of another well to supply their new home with water. This second well was drilled following several instances in which the first well, bored at petitioner's

direction to supply water to the house it constructed and sold to respondents, was not able to produce an amount adequate for the Fricke family's daily use. The District Court, after hearing testimony concerning the drilling and testing of the two wells, determined that there had been no breach by petitioner of its implied warranty of habitability as created by Md. Code (1974, 1978 Cum. Supp.), § 10-203 (a) (4) of the Real Property Article, which we will later set out, and denied to the Frickes recovery for the cost of drilling the additional well. In an on the record appeal to it, the Circuit Court for Baltimore County found the District Court's interpretation of the evidence to be clearly erroneous under Maryland Rule 1386 and entered judgment in respondents' favor in the amount of $3763 for the cost of the second well.[1] Petitioner then sought and was granted a writ of certiorari by this Court. Although we agree with the circuit court that the factual findings upon which the District Court based its determination will not support its judgment, we think the circuit court was in error in substituting its own factual findings for those of the District Court on the question of damages and will, therefore, direct a remand of this case to the District Court for further proceedings with respect to that issue.

The two wells that are the center of this controversy are both located on the same one and one-quarter acre lot in the Phoenix area of suburban Baltimore County. The initial well was drilled in November 1975 for Loch Hill Construction Company, then the lot's owner, by G. Edgar Harr Sons' Corporation, which was joined in this action in the District Court as a third-party defendant.[2] After the well was drilled to a depth of 223 feet, its production capacity was tested over

---

1. The District Court also entered a judgment against Loch Hill Construction Company for $1156.22 to cover the cost of repairs undertaken on the house by respondents because of poor workmanship. This award was affirmed by the circuit court and petitioner has not questioned the validity of that determination here.

2. G. Edgar Harr Sons' Corporation has filed a brief in this Court in which it states that, having been relieved of liability by the District Court and not having participated in the appeal to the circuit court, it acts here only as an "interested party."

a six-hour period. During that time, according to the drilling company, the well produced an average of five gallons per minute, which was more than sufficient to comply with the Baltimore County Health Department's standard of two gallons per minute. In April of the following year, subject to the condition it be completed, the respondents purchased from petitioner for $132,500 the dwelling being constructed on the lot containing the well. Settlement under the contract of sale took place in the summer of 1976 shortly after respondents and their three teenage children moved into their newly completed home.

After the Fricke family used the well for approximately thirty days, it became dry. Though this water supply deficiency recurred on the average of once a month, Howard Fricke testified before the District Court that for the first several months he thought it simply might be the result of his family's water usage habits. In February 1977, however, he changed his mind for one Saturday afternoon, following the use of water merely for one load of laundry, a shower, and the hosing off of a small patio in the back yard, the supply was exhausted. As a result, respondents decided to test the amount of water the well was producing and, not realizing which company had originally drilled the well, contacted G. Edgar Harr Sons' Corporation to do the work. This test, conducted on February 25, 1977, revealed that the well's water recovery rate was then only four gallons in ten minutes, or four-tenths of a gallon per minute. As a result, G. Edgar Harr Sons' Corporation suggested respondents drill a new well. When the Frickes contacted Loch Hill Construction Company about remedying the situation, Loch Hill offered to deepen the existing well. Respondents refused this offer and instead employed G. Edgar Harr Sons' Corporation to drill a new well. In its first attempt, a 300-foot dry hole was bored but, after beginning anew at a different location on the lot, a 200-foot well was drilled that produced a flow of six gallons per minute. This well, the Frickes say, has ended their water supply problem.

When the petitioner rebuffed their attempts to obtain payment for the cost of the new well, the Frickes filed this

suit in the District Court. That court determined that, under section 10-203 (a) (4) of the Real Property Article, as a condition of its sale there is an implied warranty that a new residence will have an adequate supply of potable water. It further ruled, however, that there was no breach of this warranty in this case because the original well, even though producing only four-tenths of a gallon per minute, would, when considered with the well's storage capacity, meet the Baltimore County requirements and because the testimony presented concerning the capacity of that well, when compared with the amount of water normally needed for a family of five, showed that the supply was sufficient to render the home "fit for habitation." In reversing this ruling, the circuit court found the District Court's interpretation was "clearly erroneous" because, according to that court, the well did not meet Baltimore County's minimum yield requirement. As a result, the circuit court entered a judgment against Loch Hill Construction Company for the cost of the new well, a determination the petitioner now seeks to have reversed.

Although the existence of implied warranties arising from the construction and sale of new residential dwellings was first recognized by a court in this country only a little over two decades ago, *Vanderschrier v. Aaron,* 103 Ohio App. 340, 140 N.E.2d 819, 821 (1957), since that time judicial acceptance of such warranties has spread rapidly until at present new home purchasers in over one-half of the states enjoy the protection of at least some type of implied warranty.[3] *See* Roeser, *The Implied Warranty of Habitability in the Sale of New Housing: The Trend in Illinois,* 1978 So. Ill. U.L.J. 178,

---

3. The initial break with the established rule of caveat emptor in the sale of real property came in the courts of Great Britain, as is illustrated by the case of Perry v. Sharon Development Co., Ltd., [1937] 4 All E.R. 390. In *Perry,* the court held that the sale of an uncompleted dwelling created an implied warranty that all building work would be properly done because the vendor was then contracting to do such work as well as to sell a structure and because the buyer could not inspect the entire residence as it was incomplete. *Id.* at 395. Although some American courts initially applied these warranties only to the sale of uncompleted new homes, the trend now is to include the finished product. *See generally* 6 R. Powell, *The Law of Real Property* ¶ 938.2, at 370.29-.43 (P. Rohan 1979); 7 S. Williston, *A Treatise on the Law of Contracts* § 926A, at 802-18 (3d ed. W. Jaeger 1963); Annot., 25 A.L.R.3d 383, 413-25 (1969).

178 & n. 1. Several times prior to 1970 this Court considered the status of implied warranties in the sale of new residences and determined that, absent legislative authorization, such a sale in Maryland did not incorporate any such guarantees. *E.g., Neary v. Posner,* 253 Md. 401, 405, 252 A. 2d 843, 846 (1969); *Allen v. Wilkinson,* 250 Md. 395, 398, 243 A. 2d 515, 517 (1968); *see Worthington Constr. v. Moore,* 266 Md. 19, 21-22, 291 A. 2d 466, 467 (1972) (applying pre-1970 law). In that year, the General Assembly enacted a new statute providing that specified implied warranties arose with the purchase of a new house. 1970 Md. Laws, ch. 151, § 1 (initially codified at Md. Code (1957, 1966 Repl. Vol., 1970 Cum. Supp.), Art. 21, § 95B). The current successor to that act's implied warranty provision is found in section 10-203 (a) of the Real Property Article and declares:

(a) *Warranties which are implied.* — Except as provided in subsection (b) or unless excluded or modified pursuant to subsection (d), in every sale, warranties are implied that, at the time of the delivery of the deed to a completed improvement or at the time of completion of an improvement not completed when the deed is delivered, the improvement is:

(1) Free from faulty materials;

(2) Constructed according to sound engineering standards;

(3) Constructed in a workmanlike manner; and

(4) Fit for habitation. [Md. Code (1974, 1978 Cum. Supp.), § 10-203 (a) of the Real Property Article.[4]

---

4. As currently codified, section 10-203 (a) became effective July 1, 1976. 1976 Md. Laws, ch. 572, § 2. Although testimony before the District Court indicated that the delivery of the deed in this instance occurred on July 31, 1976, petitioner nonetheless asserts that the applicable statute is that in effect on June 30, 1976. At that time, section 10-203 (a) (4) read:

(a) *Warranties which are implied.* — Except as provided in subsection (b) or unless excluded or modified pursuant to subsection (d), in every sale, warranties are implied that the improvement is:

\* \* \*

(4) Fit for habitation, at the time of the delivery of the deed to a completed improvement, or at the time of completion of an

In examining section 10-203 more closely, as we must do because it defines the scope of implied warranties in the sale of a new house, we first note that it pertains to "improvements," which are defined in section 10-201 of the Real Property Article to include "every newly constructed private dwelling unit, and fixture and structure which is made a part of a newly constructed private dwelling unit at the time of construction by any building contractor or subcontractor." Md. Code (1974), § 10-201 (b) of the Real Property Article. Petitioner has not contended, and correctly so in our estimation, that the dwelling involved here is not such an "improvement." Nor do we think the statute could in any way be construed as not applying to the petitioner and the respondents here, for, by its terms, Loch Hill Construction Company, as a "person engaged in the business of erecting or otherwise creating an improvement on realty," is a "vendor" within the meaning of section 10-201, *id.* § 10-201 (e), while the Frickes, as "the original purchaser[s] of improved realty," are "purchaser[s]" under that section, *id.* § 10-201 (c). In continuing our examination of section 10-203, we find that the exceptions and exclusions provided for in subsections (b) and (d) have no relevance here. Whether a well will properly supply a new residence with water is not normally a "condition that an inspection of the premises would reveal to a reasonably diligent purchaser at the time the contract is signed" and thus would not be excepted by subsection (b) from the implied warranties of section 10-203 (a). *Id.* § 10-203 (b). Neither do we find in the contract of sale evidence of any attempt by the parties under subsection (d) to exclude or modify, wholly or partially, the warranties established by section 10-203 (a). *Id.* § 10-203 (d). Thus, the statute's provisions contain no impediment to a finding that petitioner, in selling this new home with its well, by implica-

---

improvement not completed when the deed is delivered. [Md. Code (1974), § 10-203 (a) (4) of the Real Property Article.]

Because we discern no difference, other than one of style, between the current section 10-203 (a) and its predecessor, at least as to subsection (4), we think that our interpretation here would be applicable to both and will merely refer to the section's present codification.

tion warranted under section 10-203 (a) (4) that the premises were "fit for habitation."

In determining whether an existing condition relating to a new dwelling renders it uninhabitable under section 10-203 (a) (4),[5] the test is one of reasonableness. *See, e.g., Coney v. Stewart,* 263 Ark. 148, 562 S.W.2d 619, 621 (1978); *Smith v. Old Warson Development Company,* 479 S.W.2d 795, 801 (Mo. 1972); *Jeanguneat v. Jackie Hames Const. Co.,* 576 P. 2d 761, 764 (Okla. 1978); *Yepsen v. Burgess,* 269 Or. 635, 525 P. 2d 1019, 1022 (1974); *Padula v. J.J.Deb-Cin Homes, Inc.,* 111 R.I. 29, 298 A. 2d 529, 531 (1973); *Rutledge v. Dodenhoff,* 254 S.C. 407, 175 S.E.2d 792, 795 (1970); *Waggoner v. Midwestern Development, Inc.,* 83 S.D. 57, 154 N.W.2d 803, 809 (1967). Accordingly, in any breach of contract action the answer to an inquiry concerning a violation of an implied warranty of habitability depends on the circumstances of the particular case. As a consequence, using the requirements of applicable governmental regulations, such as a building or housing code, together with any other evidence showing the customary or usual conditions that render habitable a new home of like kind and quality in the area where the dwelling has been constructed, if, as no doubt will frequently prove true, rational minds would disagree on the issue of fitness for habitation, the resolution of that issue rests with the trier of

---

**5.** Courts have recognized that conditions that may render a residence uninhabitable are not only those caused by structural defects resulting from material or workmanship failure, but also include those that relate to characteristics of the site upon which the new dwelling is built. Elderkin v. Gaster, 447 Pa. 118, 288 A. 2d 771, 777 (1972) (impure water supply from well); *see* Forbes v. Mercado, 283 Or. 291, 583 P. 2d 552, 553 (1978) (same). *Compare* Waggoner v. Midwestern Development, Inc., 83 S.D. 57, 154 N.W.2d 803, 804-05, 809 (1967) (damage to dwelling's foundation from underground springs could breach implied warranty of habitability) *and* House v. Thornton, 76 Wash.2d 428, 457 P. 2d 199, 203-04 (1969) (cracking and shifting of foundation caused by instability of terrain upon which dwelling built breaches implied warranty of habitability) *with* Beri, Inc. v. Salishan Properties, Inc., 282 Or. 569, 580 P. 2d 173, 175 (1978) (erosion of oceanfront property does not breach implied warranty of habitability as defect not product of builder's work on the land). The deficiency alleged in the case now before us, lack of an adequate water supply, brings into question a condition of the land that directly impacts on one living in the house and thus can be the type of defect that could breach petitioner's implied warranty of habitability.

fact; otherwise, the court makes the determination as a matter of law.[6]

Considering the case before us in light of this standard, we have no hesitancy in determining that reasonable minds would not differ in reaching the conclusion that an adequate supply of water to and within the Fricke home was necessary to make it habitable. From time immemorial water has been a necessity for sustaining the physical well-being of humankind and a dwelling site to which it is not reasonably available is not habitable. While at one time a house that was close enough to allow its inhabitants to walk or ride to a water supply that could be taken and returned to the dwelling was one "fit for habitation," this is no longer true in urban American society. Improved techniques of well drilling and the building of complex water supply and sewerage systems have created a reasonable expectation on the part of purchasers that every new urban dwelling will be supplied adequately with water, whether from a nearby well or from an area-wide supply system. We thus conclude that, unless exempted or excluded by the terms of the statute, a new dwelling that is without a proper supply of water breaches a vendor's implied warranty of habitability under section 10-203 (a) (4).[7] *Krol v. York Terrace Bldg., Inc.,* 35 Md. App. 321, 330, 370 A. 2d 589, 594-95 (1977); *Lyon v. Ward,* 28 N.C. App. 446, 221 S.E.2d 727, 729-30 (1976); *see Forbes v. Mercado,* 283 Or. 291, 583 P. 2d 552, 553 (1978) (quality of water); *Elderkin v. Gaster,* 447 Pa. 118, 288 A. 2d 771, 777 (1972) (same).

---

6. Although this Court heretofore has recognized that compliance with an applicable building code requirement is an implied contractual condition, Hooton v. Kenneth B. Mumaw P. & H. Co., 271 Md. 565, 571, 318 A. 2d 514, 517 (1974); Denice v. Spotswood I. Quinby, Inc., 248 Md. 428, 433-38, 237 A. 2d 4, 6-9 (1968), we do not think that such noncompliance in and of itself breaches the implied warranty of habitability imposed by section 10-203 (a) (4). *But see* Carpenter v. Donohoe, 154 Colo. 78, 388 P. 2d 399, 402 (1964); Goggin v. Fox Valley Const. Corp., 48 Ill. App. 3d 103, 365 N.E.2d 509, 511 (1977). Rather, we conclude that when the condition that it is urged renders the new dwelling *not to be "fit for habitation"* is regulated by a building code requirement, then such a provision not only acts as a guide in determining the issue of habitability but also aids in ascertaining what is necessary to make the new home "fit for habitation."

7. Of course, the amount of water and the manner by which it is made available to a new dwelling in order to make the residence habitable will depend on a variety of factors, including the home's location.

Recognizing then that a proper supply of water had to be readily obtainable if this dwelling was to be "fit for habitation," we next confront the issue of how much water need be available to meet that requirement. In this instance, the District Court, in finding the Fricke's water supply to be adequate, concluded that the original well, from the date of the initial test in November 1975, continued to meet the applicable building code provision — the county health department's minimum yield requirement of two gallons per minute for six hours. In reviewing the record, however, we find, as did the circuit court, that this conclusion, not being supported by the evidence, is clearly erroneous. The parties agree that at least by February 1977 the well was yielding only four-tenths of a gallon per minute. At this rate, the well could produce only 144 gallons in six hours (.4 gal./min. x 60 mins. x 6 hrs.). This, according to the testimony of the chief of the Sanitary Engineering Division of the Baltimore County Health Department, could be added to the 282 gallon storage capacity of the well (188 ft. of storage space x 1.5 gals./ft.) to determine whether the building code's requirement was met.[8] Yet, this 426 gallons is far below the 720 gallons that would have to be available, as a minimum, in order to meet the test (2 gals./min. x 60 mins. x 6 hrs.). This means that if the well, filled to its storage capacity, was drained at a rate of two gallons per minute, it would be pumped dry in a little under three hours, far short of the six hours needed to meet the county's test. Thus, we again have no difficulty in determining that under these circumstances, reasonable minds would not differ in concluding that the supply provided by the vendor here was not adequate to make the Fricke home habitable and, therefore, as a matter of law, breaches its implied warrant to that effect.[9]

8. Whether the storage capacity within the well can be considered in calculating its yield is not before us and thus we express no opinion as to the Sanitary Engineering Division chief's interpretation in this regard.

9. In asserting that there was no breach of the implied warranty of habitability here, petitioner, as did the District Court after finding the well complied with the county's requirement, relies on a comparison of the amount of water available to the Frickes from the well over a 24-hour period with the quantity required to satisfy the average daily needs of a family of five. Petitioner's conclusion that the dwelling was fit for habitation is based on the following reasoning: A family of five, according to the testimony of

In so stating, we do not mean to imply that the mere showing by a homeowner that his well did not produce sufficient water precludes the vendor from demonstrating there was no warranty violation on its part. Yet, unless the vendor can satisfy the trier of fact by probative evidence that the absence of a proper water supply following the transfer of title resulted solely from acts of another for which the vendor was not responsible or was caused by a phenomena of such suddenness and magnitude that it can properly be classified as an "act of God" (i.e., earthquake), establishing such a water shortage entitles the purchaser to a verdict for the damages he suffered. *See Jeanguneat v. Jackie Hames Const. Co., supra,* 576 P. 2d at 765. Though in the case now before us there was speculation by several well drilling experts that the decrease in the flow of water from the first well could have been caused by something beyond the petitioner's control, nonetheless no one sought to give an explanation, supported by proper evidence, that tended to prove that the decline in the well's productivity resulted from any of the causes to which we have just alluded. Without any such evidence, petitioner must bear liability for the well's failure. In making this ruling we are cognizant of the fact that the vendor in situations such as exists here is required to assume an imposing burden. This, however, is the consequence of the legislature's decision to imply such a warranty. By doing so, the General Assembly, though not imposing liability without fault and providing for exemption through specific contractual agreement, nonetheless indicated its intent that because the vendor has a superior knowledge of the structure it had built or sold and profited by receiving a fair price, as between it and. the innocent purchaser, the purchaser should be protected from latent de-

---

experts in the case, uses, on the average, between 350 and 500 gallons of water daily. The well, on the other hand, could make available to the Frickes over a 24-hour period a total of 868 gallons of water (282 gallons of storage capacity + .4 gal./min. x 60 mins. x 24 hrs.). Thus, petitioner asserts, the water supply is more than sufficient to fulfill reasonably the Frickes' daily needs. This rationale, however, is not persuasive for it does not take into account a vitally important factor recognized by the Baltimore County test, that is, that a family's water usage almost inevitably will be concentrated into the waking hours of the 24-hour day.

fects that render his new dwelling not "fit for habitation." [10]
*See, e.g., Coney v. Stewart, supra,* 562 S.W.2d at 621;
*Bethlahmy v. Bechtel,* 91 Idaho 55, 415 P. 2d 698, 710 (1966);
*Yepsen v. Burgess, supra,* 525 P. 2d at 1022; *Elderkin v.
Gaster, supra,* 288 A. 2d at 777; *Lane v. Trenholm Bldg. Co.,*
267 S.C. 497, 229 S.E.2d 728, 731 (1976); *House v. Thornton,*
76 Wash. 2d 428, 457 P. 2d 199, 204 (1969).

Finding ourselves in agreement with the Circuit Court for
Baltimore County that the failure of the well on the Frickes'
property constituted a breach of Loch Hill Construction
Company's implied warranty that the house it built and sold
to the Frickes was "fit for habitation," we nonetheless must
vacate that court's decision with respect to the damages it
assessed. Because the issue was properly raised at trial, the
petitioner is correct in asserting that it is entitled to a ruling
on whether the Frickes, in drilling a new well, acted
reasonably to minimize the damage caused by the breach of
warranty. *See Slaska v. Idzi,* 186 Md. 530, 534, 47 A. 2d 503,
504-05 (1946); *Petite v. Homes, Inc.,* 184 Md. 377, 386, 41 A.
2d 71, 76 (1945). This question being factual, *see United Ass'n
of Journ. & App. of Plumbing, etc. v. Stine,* 76 Nev. 189, 351
P. 2d 965, 980-81 (1960); *Jamestown Terminal Elevator, Inc.
v. Hieb,* 246 N.W.2d 736, 742 (N.D. 1976), its initial resolution
must be left to the District Court as the trier of fact. *See
Kowell Ford, Inc. v. Doolan,* 283 Md. 579, 584, 391 A. 2d 840,
843 (1978). Although, under the view adopted by the District

---

**10.** This same rationale goes far toward answering petitioner's suggestion
that under section 10-203 (a)(4) a vendor is only responsible for those defects
that are present "at the time of the delivery of the deed," Md. Code (1974,
1978 Cum. Supp.), § 10-203 (a) of the Real Property Article, so that, because
this well originally met the Baltimore County standard and there was no
showing by respondents pinpointing when the well failed to do so, petitioner
should be relieved of liability. This interpretation, however, ignores that
section 10-204 (b) (1) of the Real Property Article provides that any implied
warranty, including habitability, continues for one year after delivery of the
completed improvement to the purchaser or after he takes possession,
whichever occurs first. *Id.* (1974), § 10-204 (b) (1). To read section 10-203 (a)
as narrowing the scope of the protection afforded the purchaser would totally
frustrate the purpose of the legislature in protecting the buyer from any
latent defect that, although apparently not in existence at the time of
possession or delivery of the deed, nonetheless becomes patent during the
first year of occupancy. *See* Krol v. York Terrace Bldg., Inc., 35 Md. App.
321, 328-29, 370 A. 2d 589, 594 (1977).

Court, it was unnecessary for it to resolve the damage issue, we note that there was conflicting evidence introduced by the parties as to whether drilling the first well deeper would have been an effective, reasonable, and less expensive means of remedying the Frickes' water problem. A resolution of this conflict is now in order.

> *Judgment of the Circuit Court for Baltimore County affirmed on the issue of liability and reversed as to its assessment of damages and case remanded to that court with instructions that it remand the case to the District Court of Maryland for a new trial with respect to damages. Costs to be paid equally by the parties.*