115 P.3d 1009 (2005)
Gregory and Elaine SLOAN, Appellants/Cross-Respondents,
v.
Larry and Blanca THOMPSON, and the marital community thereof, Respondents/Cross-Appellants.
Nos. 54122-6-I, 54990-1-I.
The Court of Appeals of Washington, Division One.
July 5, 2005.
*1010 K. Garl Long, Attorney at Law, Mount Vernon, WA, for Appellants.
Kenneth W. Masters, Wiggins & Masters, Bainbridge Island, WA, for Respondents.
*1011 GROSSE, J.
¶ 1 Larry Thompson knew what the building codes were for framing a house and yet proceeded to build one without permits that was woefully defective. Thompson by his own admission possessed the requisite knowledge of a defect to support a finding of fraudulent concealment. Because the trial court erred in applying the law of fraudulent concealment to the facts of this case, we reverse and remand for entry of a judgment consistent with this decision.

FACTS
¶ 2 Between 1982 and 1984, Larry Thompson acquired three lots in the Lake Cavanaugh area of Skagit County. In 1985, Thompson cleared Lot 3 and prepared an area on which to move a 1930's era house that he had acquired onto the property. In so doing, he poured a concrete slab on which he framed a first floor. He then jacked up the old house, which was cut in two pieces to facilitate moving, and placed it on top of, and attached it to, the first story frame that he had built himself. Perched atop the frame, the 1930's era structure remained separated by a small space where Thompson constructed a narrow corridor to reunite the two pieces of the older structure. Thompson obtained only an electrical hook-up permit and did all of the construction himself without acquiring permits or consulting the applicable building codes.
¶ 3 The Thompsons lived in the house on and off over a period of six years. In 1991, the Thompsons decided to relocate to Utah and sought a buyer for two of the lots, including the one containing the house. Glen and Tonya Young responded and entered into a real estate contract with Thompson in 1992 consisting of a $20,000 down payment and monthly payments of $1000. For personal reasons, Glen needed to get out of the deal and deeded the property back to Thompson and continued to rent the home for another two years.
¶ 4 Thompson met Greg Sloan in the spring of 1994. Sloan ran a logging company doing logging on a neighbor's property and contacted Thompson regarding access across his property. During the course of these conversations, Sloan inquired about the possibility of renting or purchasing the house and acreage. An agreement was eventually reached that called for monthly payments of $600, of which $300 was to go towards a down payment of $10,000. The total purchase price was set at $125,000.
¶ 5 At the time this agreement was executed there was virtually no discussion of the property, other than the maintenance of the water system. Thompson orally agreed to install a well, but never fulfilled that promise. At trial, Sloan testified that he asked Thompson if he knew who built the house and Thompson said that he did. Sloan testified that he assumed that Thompson meant that he had a contractor build the house for him.
¶ 6 The Sloans walked through the building and then proceeded to occupy it for three years. During this period of time the Sloans became aware that the roof leaked, the house shook, the decks were rotted, some of the electrical outlets did not work, and the toilets did not flush properly. Sloan complained immediately about the roof, got assurances from Thompson that he would repair it, Sloan patched it several times, and then replaced a large section, noting considerable rot in the roof. During this time there was extensive water intrusion into the house. After the roof replacement, Sloan did not experience any more significant leaking. Meanwhile, Sloan had obtained bids to put in a well, which were rejected by Thompson, and Thompson reneged on his agreement to fix the roof.
¶ 7 In 1997, the Sloans thought they had paid enough to complete the $10,000 down payment, and so pursued a real estate contract with Thompson. The parties argued over the terms and in the end they completed paperwork for the sale, using a printed form offered by Thompson, in which, unbelievably, the Sloans gave up their right to the $10,000 paid as a down payment (crediting the rent). Thompson did, however, credit the Sloans with $3,000 to compensate for his failure to install the promised well. The Sloans requested no information, and Thompson made no representations. Furthermore, the parties initialed in at least two *1012 places on the contract standard "as is" language, indicating their agreement that the Sloans had inspected the property and were satisfied.
¶ 8 In 1998, there was a small earthquake, which caused the house to move slightly and part of the deck to collapse. Sloan removed the deck. Then in 2000, there was a larger earthquake at which time the floor of the moved-in house began to pull away from the sides and threatened to collapse. When Sloan began shoring up the timbers and pulling off wall coverings, he found what various experts testified at trial in terms of inadequate and dangerous building practices employed in the construction of the home. Experts testified at trial that Thompson's construction work on the foundation and framing of the first floor of the house was structurally unsound. There were also significant defects in the work Thompson did on the plumbing and electrical systems, and the septic system he installed was done without a permit, was improperly sized, and did not have a functioning drain field. They also testified that the house now is not fit for safe habitation and must be demolished. The experts' testimony stands unrefuted.
¶ 9 Sloan testified at trial that after the second earthquake he went to the Skagit County permitting center to find the building permits for the house, but was unable to locate any. Sloan has since been served with a notice of violation from Skagit County subjecting him to the various fees and civil penalties for construction of a residence without the required permits, review and inspections. He now faces the choice of either bringing the house up to code or demolishing it.
¶ 10 In January 2002, the Sloans filed this lawsuit claiming fraudulent concealment and breach of contract and requesting specific performance of the real estate contract, unspecified damages, and attorney fees. They later amended the complaint to include a consumer protection claim. The Thompsons answered and filed counterclaims claiming breach of contract, waste, and timber trespass. In February 2003, the Sloans filed a jury demand which the Thompsons opposed. The Thompsons claimed that the jury issues were too inextricably bound up with the non-jury issues to allow for a reasonable bifurcation of the trial. The Sloans filed a brief in response, arguing that the issues in this case were primarily factual and that any equitable issues could be reserved to the court to be based on the jury's factual determinations. The court denied the Sloans' jury demand without explanation.
¶ 11 After a bench trial, the superior court found in favor of the Thompsons as to the fraudulent concealment and consumer protection claims. The court concluded that there was no evidence that Thompson intentionally, recklessly or negligently misled the Sloans by statement or omission or concealed any defects within the property. The court also concluded that the "as-is" provision in the contract was enforceable against the Sloans and that the Sloans were extremely negligent in failing to employ any of the usual safeguards to determine whether they were getting what they thought they were getting. The court therefore dismissed their fraudulent concealment claim with prejudice. The court also dismissed the consumer protection claim with prejudice because the court determined that this was a private dispute and that no fraud or misrepresentation took place. The court determined that the Thompsons were entitled to 80 percent of their attorney fees because the "greater part of the lawsuit involved developing and defending the fraudulent concealment claim."[1]
¶ 12 Furthermore, the superior court retained jurisdiction over the issue of the water system and required the Thompsons to adjust the lot line so that the entire water system was contained within the Sloans' property or to install a well to serve the Sloans' property. Thompson adjusted the lot line as asked, but when it became apparent to the court that the water system still was incapable of providing potable water to the Sloans, the court amended its judgment to require the Thompsons to install a well. The Thompsons cross-appeal from this amended court order. The Sloans appeal from the court's judgment on the fraudulent concealment claim, the consumer protection claim, *1013 the denial of the jury demand, and the award of attorney's fees.

ANALYSIS

Fraudulent Concealment
¶ 13 "In the sale of residential dwellings, the doctrine of caveat emptor no longer applies `to the complete exclusion of any moral and legal obligation to disclose material facts not readily observable upon reasonable inspection by the purchaser.'"[2] Thus, a builder-vendor of a residential dwelling has a duty to speak in those situations where:
there is a concealed defect in the premises of the residential dwelling, the builder-vendor has knowledge of the defect, the defect is dangerous to the property, health or life of the purchaser, and the defect is unknown to the purchaser and a careful, reasonable inspection on the part of the purchaser would not disclose the defect.[3]
Furthermore, "the defect complained of must `substantially affect[] adversely the value of the property or operate[] to materially impair or defeat the purpose of the transaction.'"[4] "In such a situation, a builder-vendor's failure to inform the purchasers of the defect constitutes fraudulent concealment."[5]
¶ 14 However, fraudulent concealment does not extend to those situations where the defect is apparent.[6] In other words, "in those situations where a purchaser discovers evidence of a defect, the purchaser is obligated to inquire further."[7]
¶ 15 Here, the Sloans claim several concealed defects existed in the house, and the superior court agreed that the defects were serious enough to meet the standard for a fraudulent concealment claim. The defects the Sloans claimed, and submitted unrefuted expert testimony to support, included structural defects, plumbing defects, electrical defects, and defects in the domestic water system and septic system.
¶ 16 Structural engineering experts testified that the lower level was built by "someone who really didn't know anything about construction" and that the construction was "not up to standard or required code building practices."[8] Another expert testified that he could not find anything "ethical" or "legal" about the foundation of the home laid by Thompson.[9] And yet another expert, at times holding back laughter, testified that Thompson's framing of the first floor appeared to have been done by someone without knowledge of basic carpentry methods and Uniform Building Code requirements and was "the worst thing [he had] ever seen."[10] While discussing Thompson's faulty wall support construction, the expert testified that "[t]o a guy with my experience, the building would've been out and out dangerous to even walk around in it and I wouldn't have done it."[11]
¶ 17 He also wrote in his report, "The general structure appears to be sound when looking at areas that are still covered, but in *1014 most places where it has been uncovered, there's rotting and extremely faulty construction."[12] He also testified that there was rotting damage in the house but that in his opinion, "the bigger problem was the original member construction and the method of construction."[13]
¶ 18 A plumbing expert also testified that the toilets were not properly vented and that some of the pipes ran up hill, and an electrician testified to "multiple code infractions and unsafe wiring" hidden behind wall coverings.[14] Furthermore, a septic system expert testified that the system installed by Thompson was not built to code.[15] And finally, another expert testified that the open domestic water system installed by Thompson failed to provide potable water to the house.[16]
¶ 19 When the elements of fraudulent concealment are properly applied to the facts of this case we find it impossible to arrive at the same conclusion as the superior court. The superior court stated in its memorandum decision that "there is no evidence of fraud or concealment" and that "[w]hile the defects of the house clearly meet that standard, the proof is not there to establish a knowing misrepresentation of material fact (or failure to disclose the same) made with the intent to induce the purchase, on which the purchaser reasonably relied."[17] And in the conclusions of law, the superior court stated that "[t]here is no evidence that Mr. Thompson intentionally, recklessly or negligently misled the Sloans, whether by statement or omission, as to any aspect of the structure, nor is there any evidence that he intentionally, recklessly or negligently concealed any defects with the property."[18] It is clear from this trial the superior court misapprehended the law.
¶ 20 As the Washington Supreme Court has stated, intent is not an element of a cause of action for fraudulent concealment.[19] What is important is not the mental state of the builder-vendor, but his or her actual, subjective knowledge of the defect.[20] "[A]ctual knowledge can be proved by circumstantial evidence."[21] And "[a]ctual knowledge of a defect does not necessarily mean actual knowledge that an injury will result."[22]
¶ 21 Here, Thompson admitted to doing all of the defective construction himself, without permits and without consulting the code, so he cannot claim ignorance of the conditions that were later determined to be defective.[23] However, he claims in his defense he did not know that his construction was defective, and that it would be absurd to find that he had knowingly concealed defects in the home when he planned to live in it with his family. This very well may have been the reasoning employed by the superior court when it determined that Thompson had not "intentionally, recklessly or negligently concealed any defects with the property."[24] In other words, the superior court determined that while Thompson might have been a bad carpenter who constructed a defective frame, he did not know that he was constructing a defective frame and therefore could not be attributed with the requisite knowledge of the defect under a fraudulent concealment claim.
*1015 ¶ 22 However, Thompson testified that he was familiar with code books and "knew what the codes were, ... as far as framing is concerned."[25] If Thompson, by his own admission, knew the framing codes and then proceeded to construct a first floor frame that the unrefuted expert testimony and the findings of the superior court have found to be "terrible,"[26] "unsafe,"[27] "[un]ethical,"[28] and "out and out dangerous,"[29] we cannot see how Thompson cannot be attributed with knowledge of the defects, at least as far as the framing is concerned.
¶ 23 But the issue remains whether the Sloans' knowledge of other defects in the home was enough to shift the obligation to them to inquire further. The superior court thought it did, stating in its conclusions of law that the Sloans, "having lived in the house for six years between 1994 and 2000 are imputed with the knowledge of structural or other defects concerning the subject property that were obvious, namely the water system, the roof, the decks, the plumbing and electrical problems, the water intrusion, the inadequate supports, etc."[30] and that the "Sloans were extremely negligent in failing to employ any of the usual safeguards to determine whether they were getting what they thought they were getting."[31]
¶ 24 However, "a fraudulent concealment claim may exist even though the purchaser makes no inquiries which would lead him to ascertain the concealed defect."[32] Only in situations where a purchaser discovers evidence of the defect, and thus the defect is apparent, is the purchaser required to inquire further.[33]
¶ 25 In Dalarna,[34] the buyers knew the property had experienced water leakage, but claimed that the sellers had concealed the extensive nature of the leakage. This court held that the buyers' knowledge of the water leakage made the extensive nature of the leakage readily ascertainable by simply making further inquiries.[35] Thus, the court imposed on the buyers a duty to make further inquiries as to the extent of the leakage.[36]
¶ 26 Here, the Sloans testified that during the time they had lived in the house they had experienced problems with the roof, plumbing, decks, some electrical outlets did not work, and Blanca Thompson had become aware that the domestic water was causing her to become ill. While all this arguably may have put the Sloans on notice to make further inquiries in these areas, nothing in the record suggests that they possessed knowledge of the faulty framing of the lower level of the home or of the defective septic system at the time they purchased the house.
¶ 27 The experts in this case testified that the defective framing of the lower level would not have been noticeable to a trained eye if covered from view by sheetrock and/or plywood walls and ceilings. Again, the experts' testimony stands unrefuted.[37] Here, the superior court looked to other defects in the property as evidence that the structural defects in the framing of the house and the septic system were readily ascertainable. However, there is no evidence in the record to suggest that the Sloans' knowledge of *1016 other unrelated defects in the house such as the leaky roof, faulty deck, and improperly flushing toilets would have put them on notice of the structural defects in the first floor framing or in the septic system, thus making such defects readily ascertainable. In fact, all expert testimony points to the contrary, and the superior court erred in imputing such knowledge upon the Sloans.
¶ 28 Furthermore, the "as-is" provision in the purchase contract does not immunize Thompson from fraudulent concealment liability.[38] Although courts routinely enforce such "as is" clauses allocating the risk of unknown defects to the buyers, to do so where the sellers knew about the defects and withheld material information would be to blindly enforce a contract of questionable provenance, obtained by fraudulent concealment, and we will not do so.[39]
¶ 29 Finally, the Sloans' fraudulent concealment claim is not barred by the statute of limitations. The statute of limitations for fraud does not begin to run until the aggrieved party discovers the facts constituting the fraud.[40] Here, the Sloans did not discover the concealed framing defects until 2000, when Sloan removed the wall coverings after the second earthquake.[41] The Sloans then filed suit in January 2002, well within the time allowed.
¶ 30 Thus, when the elements of fraudulent concealment are properly applied to this case, the conclusion reached by the superior court is unsupportable. There are defects in the house, Thompson is imputed with knowledge of the framing defects because he put them there and knew they were defective, the Sloans did not know of the defects and undisputed expert testimony established that a careful, reasonable inspection would not have disclosed the defect in the framing.[42] Furthermore, a leaky roof and other exposed defects in the house would not have put the Sloans on notice that Thompson had perched a 1930's house atop a dangerously defective first floor frame that is now on the verge of collapsing. When the correct law is applied, the facts compel a finding of fraudulent concealment against Thompson.

Consumer Protection
¶ 31 Substantial evidence supports the superior court's finding that this is a private dispute that had no impact on the public interest and therefore the consumer protection act does not apply. Relevant factors to determining whether an action affects the public interest include:
(1) Were the alleged acts committed in the course of defendant's business? (2) Did defendant advertise to the public in general? (3) Did defendant actively solicit this particular plaintiff, indicating potential solicitation of others? (4) Did plaintiff and defendant occupy unequal bargaining positions?[43]
While "[o]rdinarily, a breach of a private contract affecting no one but the parties to the contract is not an act or practice affecting *1017 the public interest, ... it is the likelihood that additional plaintiffs have been or will be injured in exactly the same fashion that changes the factual pattern from a private dispute to one that affects the public interest."[44] While there is evidence that Thompson had purchased other properties, fixed them up and resold them to make extra money, substantial evidence supports a finding that that Thompson built this home with the intention of it being his retirement home. Thompson and his family lived in the house for the greater portion of six years and left only when personal reasons necessitated the family's relocation to Utah. Substantial evidence supports a determination that this sale did not occur within the course of Thompson's business, but was simply a private transaction.[45]

Water System (Cross-Appeal)
¶ 32 The superior court's decision to require Thompson to either adjust the lot line or dig a well to provide the Sloans with potable water apparently was predicated on its erroneous determination at trial that the water system was spring fed and a lot line adjustment would place this spring fed system entirely on the Sloans' property.[46] After Thompson submitted a request to the court for an approval of the lot line adjustment, Sloan submitted an expert's report that there was no spring on Lot 2 or Lot 3, and that the system is fed by runoff and is not acceptable for human consumption.[47] Sloan then requested the court to require Thompson to install a well if the court's intention was indeed to provide potable water. The court granted the request and amended the order to require the Thompsons to install a well.[48] This was well within the superior court's discretion.
¶ 33 For the above reasons, we affirm the superior court's judgment on the consumer protection claim and affirm its order directing Thompson to install a well. We reverse the superior court's judgment on the fraudulent concealment claim and reverse its order awarding the Thompsons attorney fees based on their successful defense at trial from the fraudulent concealment claim and remand these issues to the superior court for entry of a judgment consistent with this opinion, including an appropriate award of attorney fees to the Sloans.
WE CONCUR: COX, C.J., and COLEMAN, J.
NOTES
[1] Clerk's Papers (CP) at 56.
[2] Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wash.2d 506, 523, 799 P.2d 250 (1990) (quoting Hughes v. Stusser, 68 Wash.2d 707, 711, 415 P.2d 89 (1966)).
[3] Atherton, 115 Wash.2d at 524, 799 P.2d 250 (citing Obde, 56 Wash.2d at 452, 353 P.2d 672).
[4] Atherton, 115 Wash.2d at 524, 799 P.2d 250 (quoting Mitchell v. Straith, 40 Wash.App. 405, 411, 698 P.2d 609 (1985)).
[5] Atherton, 115 Wash.2d at 524, 799 P.2d 250 (citing Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (1960)) (duty to inform purchaser of termite condition); Perkins v. Marsh, 179 Wash. 362, 367, 37 P.2d 689 (1934) (duty to inform lessee of failure of the drainage system to carry away water during the rainy season); Luxon v. Caviezel, 42 Wash.App. 261, 264-65, 710 P.2d 809 (1985) (duty to inform purchaser of inadequate septic system); Sorrell v. Young, 6 Wash.App. 220, 225, 491 P.2d 1312 (1971) (duty to inform purchaser that lot was built up to street level with fill.)
[6] Atherton, 115 Wash.2d at 524, 799 P.2d 250.
[7] Atherton, 115 Wash.2d at 525, 799 P.2d 250 (citing Puget Sound Serv. Corp. v. Dalarna Mgmt. Corp., 51 Wash.App. 209, 752 P.2d 1353, review denied, 111 Wash.2d 1007 (1988)).
[8] Report of Proceedings (RP) (December 8, 2003) at 87.
[9] RP (December 9, 2003) at 96.
[10] RP (December 10, 2003) at 12, 14.
[11] RP (December 10, 2003) at 14.
[12] RP (December 10, 2003) at 12.
[13] RP (December 10, 2003) at 55.
[14] RP (December 9, 2003) at 13-19; RP (December 8, 2003) at 133.
[15] RP (December 10, 2003) at 80.
[16] RP (December 8, 2003) at 46.
[17] CP at 46.
[18] CP at 55.
[19] Atherton, 115 Wash.2d at 523, 799 P.2d 250.
[20] Burbo v. Harley C. Douglass, Inc., 125 Wash.App. 684, 698, 106 P.3d 258 (2005) (citing House v. Thornton, 76 Wash.2d 428, 433, 457 P.2d 199 (1969)).
[21] Burbo, 125 Wash.App. at 698, 106 P.3d 258 (citing Nauroth v. Spokane County, 121 Wash.App. 389, 393, 88 P.3d 996 (2004)).
[22] Burbo, 125 Wash.App. at 698, 106 P.3d 258 (citing Howland v. Grout, 123 Wash.App. 6, 11, 94 P.3d 332 (2004)).
[23] Thompson testified that he did not get any permits because he wanted to save money. RP (December 11, 2003) at 96.
[24] CP at 55.
[25] RP (December 11, 2003) at 16.
[26] CP at 43.
[27] CP at 44.
[28] RP (December 9, 2003) at 96.
[29] RP (December 10, 2003) at 14.
[30] CP at 55.
[31] CP at 54-55.
[32] Atherton, 115 Wash.2d at 525, 799 P.2d 250 (citing Obde, 56 Wash.2d at 453, 353 P.2d 672).
[33] Atherton, 115 Wash.2d at 524, 799 P.2d 250 (citing Dalarna, 51 Wash.App. 209, 752 P.2d 1353).
[34] Dalarna, 51 Wash.App. 209, 752 P.2d 1353.
[35] Dalarna, 51 Wash.App. at 215, 752 P.2d 1353.
[36] Dalarna, 51 Wash.App. at 215, 752 P.2d 1353.
[37] The experts testified on cross-examination that there was some deflection in the house that was apparent to the naked eye due to an inadequately sized roof beam, but this does not speak directly to the first floor framing issue, nor was it established that this deflection would have been apparent when the Sloans' purchased the home years earlier, before the earthquake.
[38] The 1997 purchase contract states:

The purchaser takes the property in an "as" is [sic] contition [sic] and as part of the negotiations and consideration inducing the vendor to sell to the purchaser is the fact that he shall make no claim or demand nor institute any suit or action which claims there has been misrepresentation.
Exhibit 78.
[39] See Syvrud v. Today Real Estate, Inc., 858 So.2d 1125, 1130 (Fla.App.2003) ("An `as is' clause in a contract for the sale of residential real property does not waive the duty ... to disclose hidden defects in the property."); Logue v. Flanagan, 213 W.Va. 552, 584 S.E.2d 186, 190 (2003) ("The existence of an `as is' clause in a contract of sale for real estate will not relieve the vendor of his obligation to disclose a condition which substantially affects the value or habitability of the property and which condition is known to the vendor, but not to the purchaser, and would not be disclosed by a reasonable and diligent inspection. Such failure to disclose constitutes fraud.").
[40] See RCW 4.16.080(4): "An action for relief upon the ground of fraud, the cause of action in such case not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud."
[41] CP at 53.
[42] See RP (December 10, 2003) at 73 (where the expert testified that the framing would have had to have been exposed "in order to get alarmed about it").
[43] Hangman Ridge v. Safeco Title, 105 Wash.2d 778, 790-1, 719 P.2d 531 (1986).
[44] Hangman Ridge, 105 Wash.2d at 790-91, 719 P.2d 531 (citing Lightfoot v. MacDonald, 86 Wash.2d 331, 334, 544 P.2d 88 (1976) and McRae v. Bolstad, 101 Wash.2d 161, 166, 676 P.2d 496 (1984)).
[45] See Svendsen v. Stock, 143 Wash.2d 546, 555, 23 P.3d 455 (2001)("[I]t is unlikely that the conduct of a single private seller would ever be within the sphere of trade and commerce and, thus, fall under the [Consumer Protection Act].").
[46] See CP at 43 n. 5. ("The Court is now satisfied that there is, indeed, a spring on the property. Thompson's testimony on this fact was not controverted. Where the water actually lies with reference to the line of Lot 3 is unresolved.").
[47] CP at 75.
[48] See CP at 96.