

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JEANNE HAWKINS and JULIE WILSON, | ) ) ) | No. 72949-7-I |
| Appellants, | ) ) | DIVISION ONE |
| v. | ) ) | |
| EMPRES HEALTHCARE MANAGEMENT, LLC (f/k/a EVERGREEN HEALTHCARE MANAGEMENT LLC); and EVERGREEN AT TALBOT ROAD, LLC d/b/a TALBOT CENTER FOR REHABILITATION AND HEALTHCARE, | ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Respondents. | ) ) ) | FILED: March 28, 2016 |

LEACH, J. — Jeanne Hawkins and Julie Wilson (collectively "Hawkins") appeal the trial court's dismissal of their claims for fraud and misrepresentation based on the defendants' alleged alteration of Hawkins's medical records. The trial court ruled that an earlier settlement agreement Hawkins signed ("the Release") barred her claims. The trial court also found that res judicata barred Hawkins's claim for declaratory relief. Because the Release does not address claims for fraudulent inducement, it does not bar those claims. We therefore reverse the trial court and remand for further proceedings. And because

Hawkins has not argued that other relief is inadequate, we affirm the trial court's dismissal of her claim for declaratory relief.

FACTS

Substantive Facts[1]

In mid-June 2007, Hawkins had surgery at Valley Medical Center. On July 9, 2007, Valley diagnosed her with a bacterial infection and discharged her directly to the Talbot Center. Her physician at Valley, Dr. Hori, prescribed two antibiotics, Gentamycin and Vancomycin, to treat her infection. On July 13, 2007, Hawkins's lab work at Talbot read, "Vancomycin trough critically high at 18.7. Called MD." On July 14, her lab work again showed abnormal results. These lab reports indicated that Hawkins was receiving an overdose of antibiotics. Talbot nonetheless continued to administer Gentamycin and Vancomycin. After experiencing a burning sensation in her throat, a dry cough, and an inability to breathe, Hawkins asked to be taken to the hospital. Hawkins's attending physician at Talbot Center, Dr. Chen, approved her transfer back to Valley.

Talbot provided Hawkins's daughter, Julie Wilson, with a copy of Hawkins's records. Talbot staff maintained all medical charts and patient care

---

[1] In reviewing a CR 12(b)(6) dismissal, we take the facts as the plaintiff stated them in the complaint. Trujillo v. Nw. Tr. Servs., Inc., 183 Wn.2d 820, 830, 355 P.3d 1100 (2015).

records for Dr. Chen's patients, and Dr. Chen did not maintain any separate charts or notes.

At Valley, emergency room physicians diagnosed Hawkins "with acute renal failure due to gentamicin and/or vancomycin nephrotoxicity and acute tubulonecrosis"—in short, kidney failure from an antibiotics overdose. For the next year and a half, Hawkins needed treatment for symptoms this overdose caused. She is permanently impaired.

Procedural Facts

Hawkins first sued Talbot in 2008. In that lawsuit ("underlying suit"), Hawkins alleged that Talbot administered the antibiotics for longer than Dr. Hori prescribed or recommended. She stated Dr. Chen did not respond to the alarming July 14 lab report. She further alleged that Dr. Chen again received alarming lab results on July 23, 2007, and simply responded in writing, "O.K." She claimed that Talbot's negligent conduct caused her injuries. She made claims of general negligence and violations of federal and state statutory standards of care. She also alleged that Talbot breached its duty of informed consent, was liable under the doctrines of corporate negligence and respondeat superior, and violated the Consumer Protection Act, chapter 19.86 RCW. Hawkins did not allege any failure to keep accurate records, falsification of medical records, dishonesty, fraud, or misrepresentation.

During discovery, Hawkins requested a complete copy of Hawkins's medical records and charts. Talbot did not provide records. Instead, it responded that it had provided Hawkins with all her medical records when it provided her daughter with a copy. Throughout the underlying suit, Hawkins relied on Talbot's representation that those medical records were complete and accurate.

Hawkins and Talbot settled on July 29, 2010. The Release states that Hawkins releases future claims against Talbot.[2] The Release contains a no-reliance clause warranting that Hawkins did not rely on any representation by Talbot "concerning the nature and extent of the injuries, and/or damages, and/or legal liability therefor." In negotiating and accepting the settlement, Hawkins considered the comparative negligence of Talbot and that of Dr. Chen as described in the records Talbot gave Wilson. Those records showed that Dr.

---

[2] The Release reads, in relevant part:
[Hawkins releases Talbot] from all claims and causes of action, . . . whether such claims or causes of action are presently known or unknown, which in any way arise out of the facts stated in the Amended Complaint . . ., or which in any way involve the diagnoses, care and treatment of Jeanne Hawkins during her stay at Talbot Center for Rehabilitation and Healthcare from July 9, 2007 to July 30, 2007.
This release is intended to cover any and all future injuries, damages or losses not known to the parties to this agreement, but which may later develop, or be discovered in connection with the above referenced diagnoses, care and treatment, or failure to diagnose or treat.
(Emphasis added.)

Chen failed to monitor her test results properly and discontinue her antibiotics. Before settlement, Talbot asserted as a defense that its staff simply followed Dr. Chen's orders.

After settling with Talbot, Hawkins sued Dr. Chen. During discovery in that suit, Dr. Chen requested and received copies of Hawkins's medical records from Talbot. During mediation in November 2011, the parties discovered that the medical records Talbot gave Dr. Chen differed from the records it gave Wilson in August 2007. The authentic records included a lab report dated July 23, 2007, reporting "HIGH" creatinine. This report was identical to the one Wilson had, except for a handwritten note and a facsimile machine date stamp. The report given to Dr. Chen had a handwritten note directing Talbot to stop administering the antibiotics, to "push fluids," and to recheck Hawkins's blood levels after three days. Dr. Chen denied making the "O.K. John Chen" note contained on the report Talbot supplied to Hawkins. He stated he did not know how or why it was made. A forensic document examiner examined the reports and concluded that the "O.K. John Chen" notes "were mechanically or electronically cut from a [common] source document and pasted onto the intended documents."

Hawkins asked Talbot for a new mediation. Talbot refused this request, calling the discrepancies in the records "'innocent and immaterial.'" Hawkins then filed this lawsuit, claiming fraud and misrepresentation based on falsified

medical records. She asked the court to rescind the Release and vacate the order of dismissal. Alternatively, she asked for a declaratory judgment saying the Release did not apply to independent causes of action based on the falsified records, including breach of some of the same federal and state laws cited in the underlying suit.

Talbot asked the trial court to dismiss Hawkins's complaint under CR 12(b)(6). It claimed that the Release barred all the claims made by Hawkins. Alternatively, Talbot claimed that Hawkins had failed to plead the fraud and misrepresentation claims sufficiently. Talbot also contended that Hawkins could not seek rescission because she had not returned the settlement money paid to her. Talbot asserted that res judicata barred Hawkins's declaratory judgment claim.

The trial court dismissed the lawsuit. It decided that the Release barred Hawkins's claims and that res judicata barred Hawkins's declaratory judgment action. The court also called it "questionable whether, as a matter of law, [Hawkins] had the right to rely on the alleged falsifications and misrepresentations." The trial court did not address Talbot's argument based on Hawkins's retention of the settlement money. Hawkins appeals.

## STANDARD OF REVIEW

This court reviews a CR 12(b)(6) dismissal de novo.[3] This rule allows a court to dismiss a lawsuit only when it appears beyond doubt that the claimant can prove no set of facts, consistent with the complaint, which would justify recovery.[4] A trial court should grant a CR 12(b)(6) dismissal "'sparingly and with care'" in the unusual case where plaintiffs' allegations show an insuperable bar to relief on the face of the complaint.[5] In reviewing a dismissal for failure to state a claim, this court assumes all facts alleged in the complaint are true.[6]

"We review a trial court's order enforcing a settlement agreement de novo if 'the evidence before the trial court consisted entirely of affidavits and the proceeding is similar to a summary judgment proceeding.'"[7] Finally, we review a trial court's dismissal of a request for declaratory relief for abuse of discretion.[8]

## ANALYSIS

We address two issues decided by the trial court. Does the Release bar Hawkins's claims in this lawsuit? Does res judicata bar Hawkins's request for

---

[3] Trujillo, 183 Wn.2d at 830.

[4] Trujillo, 183 Wn.2d at 830.

[5] Southwick v. Seattle Police Officer John Doe No. 1, 145 Wn. App. 292, 296, 186 P.3d 1089 (2008) (internal quotation marks omitted) (quoting Tenore v. AT&T Wireless Servs., 136 Wn.2d 322, 330, 962 P.2d 104 (1998)).

[6] Trujillo, 183 Wn.2d at 830.

[7] Kwiatkowski v. Drews, 142 Wn. App. 463, 479, 176 P.3d 510 (2008) (quoting Brinkerhoff v. Campbell, 99 Wn. App. 692, 696, 994 P.2d 911 (2000)).

[8] Grandmaster Sheng-Yen Lu v. King County, 110 Wn. App. 92, 99, 38 P.3d 1040 (2002).

declaratory judgment? We also consider two other issues. As a preliminary matter, we first resolve the defendants' claim that Hawkins has not preserved her rescission claims. Because it likely will arise on remand, we also discuss Hawkins's right to rely on the alleged fraud and misrepresentation.

## Preservation of Rescission Claim

The trial court did not decide if Hawkins could rescind the Release without first returning the settlement monies. Yet Talbot claims that Hawkins abandoned her rescission claim by failing to assign error to its dismissal or argue in support of it on appeal. We disagree.

Hawkins asked for rescission in her complaint and assigned error to the trial court's order of dismissal. The order makes no separate ruling on the rescission claim. Instead, this order resolves two issues. It states that the Release bars Hawkins's claims and that res judicata also bars her declaratory judgment claim. Hawkins addressed both of these issues at length in her opening brief. Because the trial court did not decide that part of Talbot's motion directed specifically to the availability of rescission, that issue is not before us. Hawkins had no obligation to address it on appeal and has not abandoned any claim.

Applicability of the Release

The trial court dismissed this case because it decided that the Release bars Hawkins's fraudulent inducement claims. Hawkins contends the trial court misread the Release, erroneously applying it to bar her suit. We agree.

We interpret settlement agreements under contract principles "'in light of the language used and the circumstances surrounding their making.'"[9] Generally, a court may void a release that was procured by fraud, misrepresentation, or overreaching or that arose from a mutual mistake.[10] Here, Talbot claims the Release language bars any claim based on any alleged fraud or misrepresentation by it that procured the settlement.

Few Washington cases have interpreted releases in this context. As a result, Talbot relies primarily on two cases from other jurisdictions, Dresden v. Detroit Macomb Hospital Corp.[11] and Kobatake v. E.I. DuPont De Nemours & Co.[12] We find Matsuura v. Alston & Bird[13] more persuasive.

In Dresden, the decedent went to the hospital complaining of chest pain.[14] The hospital discharged her after a doctor interpreted her chest X ray as

---

[9] Sherrod v. Kidd, 138 Wn. App. 73, 75, 155 P.3d 976 (2007) (quoting Stottlemyre v. Reed, 35 Wn. App. 169, 171, 665 P.2d 1383 (1983)).
[10] Del Rosario v. Del Rosario, 152 Wn.2d 375, 378, 97 P.3d 11 (2004).
[11] 218 Mich. App. 292, 553 N.W.2d 387 (1996).
[12] 162 F.3d 619 (11th Cir. 1998) (applying Georgia law).
[13] 166 F.3d 1006 (9th Cir. 1999) (applying Delaware law).
[14] Dresden, 218 Mich. App. at 294.

normal.[15] She died three days later, and her estate filed a medical malpractice lawsuit.[16] When the estate requested a copy of the chest X ray, the hospital responded that it could not find it after a diligent search.[17] The estate settled this lawsuit and signed a release without ever receiving a copy of the X ray.[18] Later, the estate became aware that a doctor may have destroyed the X ray in the belief that another doctor had misread it.[19] The estate filed a new lawsuit.[20] The trial court dismissed the new lawsuit on summary judgment.[21]

The Michigan Court of Appeals affirmed, deciding two issues relevant to this case. The court rejected the estate's claim that its release was not fairly and knowingly made because the estate knew the X ray was missing when it settled the case and signed the release.[22] The court rejected the estate's claim that the scope of the release did not include fraud claims, holding that language that released all defendants "from liability for 'any and all' causes of action that could have been based upon, or could have arisen out of, the medical care rendered to Dresden or in any manner related to Dresden" barred Dresden's fraud claims. The court reasoned that this broad language released defendants from "liability

---

[15] Dresden, 218 Mich. App. at 294.
[16] Dresden, 218 Mich. App. at 294.
[17] Dresden, 218 Mich. App. at 294.
[18] Dresden, 218 Mich. App. at 294.
[19] Dresden, 218 Mich. App. at 294.
[20] Dresden, 218 Mich. App. at 294-95.
[21] Dresden, 218 Mich. App. at 295.
[22] Dresden, 218 Mich. App. at 296.

for any and all matters and things alleged or that could have been alleged against the defendants in the lawsuit."[23]

In <u>Kobatake</u>, the Eleventh Circuit, applying Georgia law, found that general releases prohibited the plaintiff nursery owners from re-suing DuPont for damages its products caused. The parties had settled after trial. Their settlement released the defendants from "any and all liability, claims, demands, damages or rights of action . . . of any kind or character," "whether known or unknown," "arising from the beginning of time to the present," "including . . . any and all claims arising from . . . or in any way related to" plaintiffs' use of the product.[24] In their second lawsuit, this time for fraud, the plaintiffs alleged that after settlement they learned the defendants schemed to destroy harmful evidence and offered perjured testimony while defending the first lawsuit.[25] The court held the broad language of the settlement precluded these fraud claims.[26]

The court recognized that Georgia, like Washington, allows a party to rescind a release obtained through fraud. But the court held that plaintiffs could not pursue this remedy because they neither offered to return nor actually returned the settlement money.[27]

---

[23] <u>Dresden</u>, 218 Mich. App. at 298.
[24] <u>Kobatake</u>, 162 F.3d at 623.
[25] <u>Kobatake</u>, 162 F.3d at 623.
[26] <u>Kobatake</u>, 162 F.3d at 625-26.
[27] <u>Kobatake</u>, 162 F.3d at 626-27.

In contrast to <u>Dresden</u> and <u>Kobatake</u>, the Ninth Circuit has noted its unease with "conclud[ing] that a person is deemed to have released a claim of which he has no knowledge, when the ignorance of such a claim is attributable to fraudulent conduct by the released party."[28] Like the <u>Kobatake</u> plaintiffs, the plaintiffs in <u>Matsuura</u> owned nurseries, were injured by the defendants' fungicide, and settled their claims, then sued the defendants for fraudulently inducing the settlements.[29] But the Ninth Circuit, applying Delaware law, held that the general releases did not bar the plaintiffs' suit for fraud for three reasons.[30]

First, Delaware law precluded the broad reading of the release asserted by the defendants. When general language in a release follows specific recitals, those recitals restrict the general language.[31] The releases began with a recital that plaintiffs intended to end "'claims related to [their] purchase and/or use of Benlate . . . and all claims incident thereto.'" The court reasoned that these claims included only those "likely to arise or naturally arising from the [underlying] product liability claims or the litigation, which in common understanding would not

---

[28] <u>Living Designs, Inc. v. E.I. DuPont de Nemours & Co.</u>, 431 F.3d 353, 371 (9th Cir. 2005) (quoting <u>E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage</u>, 744 A.2d 457, 461 (Del. 1999)).
[29] <u>Matsuura</u>, 166 F.3d at 1007-08.
[30] <u>Matsuura</u>, 166 F.3d at 1009.
[31] <u>Matsuura</u>, 166 F.3d at 1010.

encompass claims for fraud."[32]  The court rejected the defendants' literal

interpretation of the "related to" language:

> Of course, a claim that the settlement agreements were
> fraudulently induced is "related" to the Matsuuras' use of Benlate
> and to the underlying litigation in the sense that one would not have
> occurred but for the other, but applying the phrase literally is "a
> project doomed to failure, since, as many a curbstone philosopher
> has observed, everything is related to everything else."[33]

The Ninth Circuit held that the general language of the release did not

encompass the plaintiffs' fraud claims.[34]

Second, the court predicted that the Delaware Court would likely "impose

a clear statement requirement for release of fraudulent inducement claims."[35]

After noting that Delaware requires a contract clause relieving a party from future

negligence to be "'crystal clear and unequivocal,'" the court found a release for

fraudulent inducement analogous.[36]

Third, the court noted Delaware courts' reluctance to enforce unintended

releases of fraud claims.[37]  It explained that "[i]f a release of 'any and all claims'

were held to bar this fraud action, DuPont, the alleged perpetrator of the fraud,

---

[32] Matsuura, 166 F.3d at 1010 (first alteration in original).

[33] Matsuura, 166 F.3d at 1010 (quoting Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., 519 U.S. 316, 335, 117 S. Ct. 832, 136 L. Ed. 2d 791 (1997) (Scalia, J., concurring)).

[34] Matsuura, 166 F.3d at 1010.

[35] Matsuura, 166 F.3d at 1010.

[36] Matsuura, 166 F.3d at 1010-11 (quoting State v. Interstate Amiesite Corp., 297 A.2d 41, 44 (Del. 1972)).

[37] Matsuura, 166 F.3d at 1011.

would have successfully silenced its victims by fraudulently inducing them blindly to agree in advance not to complain."[38]  The court observed that the releases before it did not mention fraudulent inducement of the releases themselves.  It concluded that a Delaware court would interpret a release to bar a fraud claim, "if ever, only if the parties clearly and affirmatively expressed their intent to do so."[39]

Finally, the court stated that enforcing the releases would undermine the policy of encouraging voluntary settlement of claims:  "if litigants cannot assume the disclosures and representations of the opposing party are made in good faith, they will be reluctant to settle.  Assurance of an adversary's good faith is particularly critical when parties are attempting to resolve a dispute amicably."[40]  We agree.

For reasons similar to those the court found persuasive in Matsuura, we conclude that the Release here does not bar Hawkins's fraudulent inducement claim.  In Washington, special recitals accompanying a release of "all claims" limit the scope of the release.[41]  Unlike the release in Kobatake, the Release does not say it is a general release:  instead of covering every claim that could have existed between the parties, it states that it releases claims that "arise out

---

[38] Matsuura, 166 F.3d at 1011.
[39] Matsuura, 166 F.3d at 1011.
[40] Matsuura, 166 F.3d at 1012.
[41] Fradkin v. Northshore Util. Dist., 96 Wn. App. 118, 128, 977 P.2d 1265 (1999).

of" the facts in Hawkins's underlying complaint or "involve" her diagnoses, care, and treatment at Talbot Center in July 2007.

"In common understanding," Hawkins's fraud claim does not fit into any of these three categories.[42] The fraudulent alteration of medical records does not "arise out of" an antibiotics overdose or the medical negligence that caused it. Nor does it "involve" the patient's diagnoses, care, or treatment in any meaningful sense. To the extent the Release is ambiguous, applying "arise out of" and "involve" to simply mean "related to," as Talbot suggested in oral arguments, is "doomed to failure" because "'everything is related to everything else.'"[43]

Also, the parties have not "clearly and affirmatively expressed their intent" to release Talbot from the alleged fraudulent inducement.[44] "'At a minimum, if one party is to be held to release a claim for fraud in the execution of the release itself, the release should include a specific statement of exculpatory language referencing the fraud.'"[45] Ordinarily, one party should be able to rely on the accuracy and completeness of the opposing party's records produced by that party. We find Talbot's claim to the contrary disturbing because it strikes at the heart of the integrity of a process intended to facilitate both fair evaluation of

---

[42] See Matsuura, 166 F.3d at 1010.

[43] Matsuura, 166 F.3d at 1010 (quoting Dillingham Constr., 519 U.S. at 335) (Scalia, J., concurring)).

[44] See Matsuura, 166 F.3d at 1011.

[45] Living Designs, 431 F.3d at 371 (quoting Fla. Evergreen, 744 A.2d at 461).

cases for settlement and fair trials. "Assurance of an adversary's good faith is particularly critical when parties are attempting to resolve a dispute amicably."[46]

The no-reliance clause makes no reference to inducing fraud.[47] It does not bar Hawkins's claims of fraudulent inducement.

Assuming the truth of the facts stated in the complaint, Talbot altered medical records to shift responsibility for negligent treatment onto a third party, Dr. Chen. Talbot falsely asserted, in a discovery response signed by counsel, that it previously provided plaintiffs with accurate and complete records. And it convinced the trial court to dismiss the plaintiffs' suit for fraud by enforcing a settlement agreement that defendants' very fraud induced the plaintiffs to sign. Because the Release is not so broad that it covers fraudulent inducement of the Release itself and because the no-reliance clause does not expressly cover fraudulent inducement, the Release does not bar Hawkins's fraud claims.

Hawkins's Right To Rely on Talbot's Representations

The trial court did not rule on Hawkins's right to rely on Talbot's representations. It instead noted that Hawkins's right to rely was "questionable," citing Kwiatkowski v. Drews.[48] Although the parties' briefs debate Hawkins's right to rely, Talbot conceded at oral argument that that issue is not properly before

---

[46] Matsuura, 166 F.3d at 1012.
[47] As noted above, whether the false medical records "concern[ ] . . . legal liability" for Hawkins's injuries is ambiguous. See Matsuura, 166 F.3d at 1010.
[48] 142 Wn. App. 463, 479-82, 176 P.3d 510 (2008).

this court. However, we note the following to guide the trial court on remand. To state a claim for fraud or intentional misrepresentation, a plaintiff must plead nine elements.[49] Two are at issue here: the plaintiff's right to rely on the truth of the defendant's representation and the plaintiff's reasonable reliance on that representation. Normally, reasonable reliance presents a question of fact. But where the court finds that no rational person could find the plaintiff reasonably relied on the defendant's representation, the trial court can decide that question as a matter of law.[50]

A no-reliance clause may negate a plaintiff's right to rely as a matter of law.[51] But, as noted above, if a plaintiff can state a claim for rescission, then the terms of the settlement agreement do not apply. In that case, the agreement's no-reliance clause cannot prevent the plaintiff from pleading fraud. And even where the settlement agreement applies, whether the court should enforce a no-reliance clause depends on the clause's specificity and the parties' circumstances. In <u>Kwiatkowski</u>, the agreement included a no-reliance clause specifying that Kwiatkowski had an opportunity to investigate his claims, made an independent decision to settle, and assumed the risk that the facts were different

---

[49] <u>Stiley v. Block</u>, 130 Wn.2d 486, 505, 925 P.2d 194 (1996).
[50] <u>Cornerstone Equip. Leasing, Inc. v. MacLeod</u>, 159 Wn. App. 899, 905, 247 P.3d 790 (2011).
[51] <u>Kwiatkowski</u>, 142 Wn. App. at 481.

than he understood them to be and new evidence could arise.[52] Federal courts applying Washington law have likewise relied on the safeguards afforded parties signing no-reliance clauses in holding that those no-reliance clauses barred the parties' fraud claims.[53]

A party may also lack reasonable reliance as a matter of law where the alleged misrepresentations go to "the very issue being resolved in the adversarial relationship" that led to the settlement.[54] For example, in Kwiatkowski, Kwiatkowski's underlying suit had alleged that the banks breached their fiduciary duty to him through misrepresentation and fraud, among other acts.[55] The mere fact that the parties had an adversarial relationship did not bar the plaintiff's reasonable reliance. Instead, Division Two found determinative that the

---

[52] Kwiatkowski, 142 Wn. App. at 473.

[53] See Insitu, Inc. v. Kent, 2009 WL 2160690, at *4 (E.D. Wash.) (court order) (analogizing to Kwiatkowski because "two sophisticated parties, each represented by counsel, were involved in an inherently adversarial settlement agreement," and noting party had 21 days to consider signing the release and 7 days to revoke it after he signed and carefully scrutinized the language); Claxton v. Pitney Bowes, 2013 WL 1290806, at *4 (E.D. Wash.) (court order) (noting the plaintiff "acknowledged that she read the Agreement, had ten days to consider whether to sign, had a reasonable opportunity to consult with an attorney if she chose, and signed the Agreement voluntarily").

Because the federal courts allow parties to cite unpublished federal opinions and orders issued on or after January 1, 2007, parties may cite those opinions in Washington courts, as well. FED. R. APP. P. 32.1; GR 14.1(b).

[54] Kwiatkowski, 142 Wn. App. at 480.

[55] Kwiatkowski, 142 Wn. App. at 479-80.

underlying suit involved the same <u>issues</u> being resolved in the suit before it: fraud, misrepresentation, or breach of fiduciary duties.[56]

<u>Declaratory Relief</u>

Finally, Hawkins asserts that the trial court erred in dismissing her fifth cause of action on the basis of res judicata. That cause of action requests a declaration that Hawkins may again bring the claims in her underlying suit despite the settlement.

This court may affirm on any basis the record supports.[57] Declaratory relief is a rare, exceptional remedy.[58] A court does not provide this remedy when it can provide an adequate alternative remedy.[59] The party seeking declaratory relief must show the absence of the alternative remedy.[60]

Hawkins's fifth cause of action asks for a declaration that she be allowed to renew her claims for negligence and related causes of action. She raised, litigated, and settled those claims with the Release. Thus, to bring those claims again, Hawkins must obtain a rescission of the Release. The declaratory judgment she asks for would have this exact effect; it is simply rescission under

---

[56] <u>Kwiatkowski</u>, 142 Wn. App. at 479-80.
[57] <u>King County v. Seawest Inv. Assocs.</u>, 141 Wn. App. 304, 310, 170 P.3d 53 (2007).
[58] <u>Grandmaster Sheng-Yen Lu</u>, 110 Wn. App. at 106.
[59] <u>Stafne v. Snohomish County</u>, 174 Wn.2d 24, 39, 271 P.3d 868 (2012).
[60] <u>Nakata v. Blue Bird, Inc.</u>, 146 Wn. App. 267, 279, 191 P.3d 900 (2008).

another name. Rescission provides an adequate alternative remedy for Hawkins. The trial court did not err in dismissing Hawkins's fifth cause of action.

## CONCLUSION

Because the trial court erred in finding that the Release bars Hawkins's fraud claims and did not decide if Hawkins waived a claim for rescission, we reverse and remand for further proceedings. But because Hawkins has an adequate alternative remedy in rescission, we affirm the dismissal of her claim for declaratory relief.

_Leach, J._

WE CONCUR:

_Spearman, C.J._           _Dwyer, J._