# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| REDSTONE BLACK LAKE 1, L.P, and REDSTONE BLACK LAKE 2, L.P. as successors in interest to Redstone Investments, LLC,<br><br>Appellant,<br><br>v.<br><br>GF CAPITAL REAL ESTATE FUND – INVESTMENT I, LLC,<br><br>Respondent. | No. 51875-9-II<br><br><br><br><br><br><br>UNPUBLISHED OPINION |

WORSWICK, J. — This case involves the sale of two commercial office buildings, Black Lake 1 and Black Lake 2 (collectively, the BL Buildings). GF Capital Real Estate Fund-Investment I LLC (GF Capital) sold the BL Buildings to Redstone Investments LLC[1] (Redstone) in 2014.

In 2017, and after discovering water infiltration, rot, and mold throughout the BL buildings, Redstone sued GF Capital, alleging that it had (1) breached warranties in the Purchase and Sale Agreement (PSA) and "PSA Amendment," (2) made negligent misrepresentations about the properties, and (3) fraudulently concealed defects in the properties. The trial court granted GF Capital's motion for summary judgment dismissal on all three claims. The trial court also awarded GF Capital attorney fees.

---

[1] Redstone Black Lake 1 L.P. and Redstone Black Lake 2 L.P. are the successors in interest to Redstone Investments LLC.

Redstone appeals, arguing that the trial court erred when it dismissed Redstone's fraudulent concealment claims and awarded attorney fees to GF Capital.[2] GF Capital argues that Redstone's claims are barred by provisions in the PSA and PSA Amendment.

We hold that (1) Redstone's claims are not barred by the PSA, (2) a question of material fact exists regarding whether the PSA Amendment bars Redstone's claims, and (3) a question of material fact exists regarding Redstone's fraudulent concealment claim. Because we reverse summary judgment dismissal of the fraudulent concealment claim, we also reverse the trial court's award of GF Capital's attorney fees. Accordingly, we reverse and remand for further proceedings.

## FACTS

A.    *Overview*

GF Capital owned several commercial buildings, including two known as Black Lake 1 and Black Lake 2. In 2014, GF Capital and Redstone entered into a PSA for Redstone to purchase the BL Buildings. The PSA allowed for a due diligence period, during which Redstone inspected the BL Buildings and sought documentation from GF Capital. Following that due diligence period, the parties executed a PSA Amendment to compensate for certain deficiencies in the BL Buildings. A year and a half after the sale, Redstone discovered mold, rot, and decay at the BL Buildings.

---

[2] Redstone does not appeal the trial court's decision to dismiss Redstone's breach of warranty or negligent misrepresentation claims.

Redstone sued GF Capital alleging fraudulent concealment, negligent misrepresentation, and breach of warranty. GF Capital moved for summary judgment seeking dismissal of all three claims. In its opposition to summary judgement dismissal, Redstone identified mold, rot, and decay as the defect in the BL Buildings. The trial court granted the summary judgment motion and also awarded GF Capital attorney fees.

B.      *GF Capital's Ownership of the Buildings*

During GF Capital's ownership of the BL Buildings, GF Capital employed Sierra Property Management, owned by Brad McKinley, to manage some of its property, including the BL Buildings. McKinley maintained the BL Buildings, sending monthly reports and bills to GF Capital.

Over the course of GF Capital's ownership, the BL Buildings experienced reoccurring issues regarding water intrusion, mold, and rot. McKinley periodically used contractors to address these problems. On multiple occasions, Servpro dried out areas of the buildings and remediated areas with mold.[3] McKinley also used Stephen Passero's company, Rainshine, to address these water-related issues. During one of those repairs, Passero alerted McKinley to rotten plywood behind the window flashings. McKinley instructed Passero to reseal the panels and cover up the rotten wood.

Before GF Capital put the BL Buildings on the market, McKinley proposed exterior repairs to prevent water intrusion. There is no evidence that GF Capital completed those repairs. GF Capital then listed the BL Buildings for sale along with an offering memorandum.

---

[3] The effectiveness of these remediation efforts was later contested by Redstone.

C.      *PSA, Due Diligence Period, and PSA Amendment*

      1.      *PSA*

GF Capital and Redstone entered into a PSA for the purchase of the BL Buildings, along with two other buildings, for $16.5 million. Relevant here are the PSA's paragraphs 8.2 and 23.6. Paragraph 8.2 of the PSA contained specific language regarding the condition of the BL Buildings and Redstone's release of claims against GF Capital. Paragraph 8.2 stated:

> EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT, THE SALE OF THE PROPERTY IS AND WILL BE MADE ON AN "AS IS," "WHERE IS," AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS AND WARRANTIES OF ANY KIND OR NATURE, EXPRESS, IMPLIED OR OTHERWISE, INCLUDING BUT NOT LIMITED TO THE DISCLAIMED MATTERS. THIS COVENANT SHALL SURVIVE CLOSING. Buyer specifically acknowledges and agrees that . . . Buyer . . . hereby waives, releases and discharges any claim or cause of action it has, might have had or may have against Seller, whether based on breach of contract, breach of applicable law, strict liability, tort, or any other legal or equitable theory or basis of liability with respect to: (i) the Disclaimed Matters, (ii) the condition of the Property as of the Closing Date, (iii) the past, present or future compliance of the Property with Environmental Laws or any other federal, state or local laws or regulations, . . . or (iv) any other state of facts that exists with respect to the Property.

Clerk's Papers (CP) at 2272-73.

The PSA also contained language regarding attorney fees in the event of litigation. Paragraph 23.6 of the PSA stated:

> [I]f any action be commenced (including an appeal thereof) to enforce any of the provisions of this Agreement . . . then the unsuccessful party therein shall pay all costs incurred by the prevailing party therein, including reasonable attorneys' fees and costs, court costs and reimbursements for any other expenses incurred in connection therewith . . . .

CP at 2289. Notably, the language in paragraph 8.2 did not specifically release fraud claims.

2. *Due Diligence Period*

The PSA allowed for a due diligence period. Redstone requested GF Capital's documentation of specific repairs to the BL Buildings. GF Capital failed to provide specific documentation regarding repairs, although it possessed these documents.

Redstone contacted Capitol Glass and Marx|Okubo (Marx) to inspect parts of the BL Buildings. Capitol Glass submitted a quote for window repairs to Redstone, and Marx developed a property condition assessment. During the due diligence period, Redstone was permitted to conduct destructive testing, although it failed to conduct such tests.

a. *Capitol Glass Window Quotes*

Ayaz Velji, Redstone's vice president, e-mailed Capitol Glass, seeking a quote to reseal and glaze the windows for the BL Buildings. Specifically, Velji asked for a quote "on re caulking and re glazing all of the windows/seals" for BL buildings and an opinion on when that work would need to be completed. Justin Perry, a Capitol Glass employee, responded on April 15, 2014. Perry provided three quotes: the first quote provided a price for replacing only the failed window units of the BL Buildings, the second quote addressed fixing the failed units and older scratched units in these buildings, and the third quote included checking "each window for need of re seal, and or re anchor of break metal."[4] CP at 724. The third quote contained the following language:

---

[4] "Break metal" are metal panels that act as dividers between windows. These are also referred to as divider panels, spandrel panels, and metal panels. We use the term "break metal."

5

> Window problems; most all of the window units in buildings 1 and 2 are very old and badly scratched they are not all failing at this time but it is a matter of time before they do fail. Some of the break metal between the windows is coming off and the caulking has failed both buildings need to be checked out and fix the break metal, re seal it and or re anchored.

CP at 724.

Perry later explained that his quote related to checking "each window for need of re seal, and or re anchor of break metal." CP at 724. He stated that the unanchored break metal and failed caulking created the potential for water and moisture getting into buildings. However, Perry testified at his deposition that moisture contained in a failed double-paned window unit is not a "concern getting into the building." CP at 1091.

b. *Marx Property Condition Assessment*

Before its inspection, Marx submitted a building condition questionnaire to GF Capital that inquired about leaks and moisture intrusion. GF Capital declined to answer these questions.

Marx employees inspected the BL Buildings in April 2014. Marx's inspectors noted numerous issues with the windows, the brick veneer, and signs of past water intrusion. Regarding the buildings' windows, the report noted, "The various methods of installation and wet sealing suggest that there have been numerous repairs over the years due to water infiltration." CP at 773. Further, Marx "observed some metal coverings which had been sealed as if they were a gasket, but the sealing there has little-to-no benefit when protecting the windows from moisture infiltration." CP at 53. However, a Marx inspector testified that the BL Buildings' window systems were part of a "ribbon window system." CP at 1114. The inspector stated that the ribbon window system should have been set up to move infiltrating moisture back out to the building's exterior.

6

Marx's report also identified issues with the brick veneer. Marx observed cracking, spalling, and signs of past water infiltration. Marx did not observe evidence of wall moisture in the buildings' interiors, but recommended Redstone periodically investigate for cracks and spalling to prevent water infiltration. Redstone's efforts during the due diligence period did not reveal evidence of mold, rot, or decay.

3.      *PSA Amendment*

After gathering information from Capitol Glass and Marx, Ali Nanji, Redstone's president, wrote in an e-mail to GF Capital's real estate broker that the BL Building windows were failing, "not just the seals but the water ingress." CP at 788. Further, he wrote, "The minimum was spent on these buildings, absolute minimum to keep them going." CP at 789. Nanji later clarified his message during his deposition, testifying that the water ingress he was referring to was not water intrusion into the BL Buildings, but rather the water into the double-paned glass that caused the window units to fog up and fail.

As a result of the property condition assessment, Redstone requested amending the PSA to lower the purchase price of the buildings. Redstone's request for a lower price was based on Redstone's discovery of several property deficiencies, including the windows.

The parties agreed to a PSA Amendment. The PSA Amendment listed deficiencies in the BL Buildings, reduced the purchase price by $500,000, and contained a release regarding "certain maintenance items" identified in an attached e-mail the parties termed the Property Condition Email. CP at 794. The PSA Amendment contained language identical to the PSA's claim-release language regarding the properties' deficiencies detailed in the Property Condition E-mail. The PSA Amendment stated that Redstone released any claims against GF Capital

"based on breach of contract, breach of applicable law, strict liability, tort, or any other legal or equitable theory or basis of liability." CP at 794-95. The PSA Amendment release did not specifically release fraud claims.

The Property Condition E-mail detailed multiple deficiencies in the properties that were not identified in the offering Memorandum. The Property Condition E-mail noted that "291 window units" in the BL Buildings would need to be replaced. CP at 798. Further, the Property Condition E-mail noted that "additional units" required resealing. CP at 798. The Property Condition E-mail listed the "Window System" as an additional repair cost of $235,000 not previously identified in the offering Memorandum. CP at 798. The Property Condition E-mail also stated, "Needless to say the window system and seals should have been regularly replaced and serviced to avoid the accumulated costs currently being faced." CP at 798.

D.      *Redstone's Ownership of the Buildings*

Redstone purchased the BL Buildings in April 2014. Eighteen months later, in October 2015, Plastering Plus Northwest inspected the BL Buildings and found water damage, rot, and mold behind windows and walls. It appears from our record on appeal that Redstone did not remediate these issues following Plastering Plus Northwest's inspection.

About a year later, Redstone discovered additional mold, rot, and decay inside the wall cavities of the BL Buildings that was hidden until it opened a wall during the course of a tenant improvement project. Following the discovery of this mold and rot, JRS Engineering inspected the BL Buildings. JRS Engineering concluded that the water intrusion and ensuing mold and rot was most likely caused by the exterior break metal panels between the windows and the joints by which the break metal panels are attached. The mold, rot, and decay caused the BL Buildings'

tenant to vacate the premises.  Redstone estimated the cost to repair the BL Buildings at over $3 million dollars.

One of the Plastering Plus Northwest inspectors testified in a deposition about his October 2015 findings.  He stated that it was highly likely that the water damage, mold, and rot he discovered in October 2015 was present when the sale took place in April 2014.  Further, Passero testified that the rot had developed over the course of years, back to GF Capital's time as owner.

E.      *Procedural History*

Redstone sued GF Capital alleging fraudulent concealment, negligent misrepresentation, and breach of warranty.  GF Capital moved for summary judgment dismissal on all three claims.

The trial court granted GF Capital's motion for summary judgment dismissal.  The trial court awarded GF Capital attorney fees based on the attorney fee provision in the PSA, RCW 4.84.330, and RCW 4.84.010.  Redstone appeals the summary judgment dismissal of its fraudulent concealment claim and the award of attorney fees.

ANALYSIS

I. SUMMARY JUDGMENT LEGAL PRINCIPLES

We review summary judgment decisions de novo and perform the same inquiry as the superior court.  *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).  We view the evidence, and all reasonable inferences therefrom, in the light most favorable to the nonmoving party.  *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015).  Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law.  CR 56(c).  A material fact is one upon which

the outcome of the litigation depends. *In re Estate of Black*, 153 Wn.2d 152, 160, 102 P.3d 796 (2004).

A defendant is entitled to summary judgment if (1) the defendant shows the absence of evidence to support the plaintiff's case and (2) the plaintiff fails to come forward with evidence creating a genuine issue of material fact on an element essential to the plaintiff's case. *Clark County Fire Dist. No. 5 v. Bullivant Houser Bailey PC*, 180 Wn. App. 689, 699, 324 P.3d 743 (2014). Where reasonable minds could reach but one conclusion from the admissible facts, summary judgment should be granted. *Elliott Bay Seafoods, Inc. v. Port of Seattle*, 124 Wn. App. 5, 12 n.2, 98 P.3d 491 (2004).

## II. "As Is" Clause and Releases in the PSA and PSA Amendment

As a threshold issue, GF Capital argues that language in the PSA and PSA Amendment bars Redstone's claims. Specifically, GF argues that the "as is" clause, the PSA release, and the PSA Amendment release bar Redstone's claims. Br. of Resp't at 21. We hold that Redstone's fraud claims are not barred by the PSA. However, Redstone raises an issue of material fact regarding whether the PSA Amendment bars its claims.

A.      *PSA Does Not Preclude Fraudulent Concealment Claims*

GF Capital argues that the "as is" clause and the general release contained in the PSA bar Redstone's fraudulent misrepresentation claims. We disagree.

1.      *"As is" Clause*

A purchase and sale contract containing an "as is" clause does not immunize a seller from fraudulent concealment liability. *Sloan v. Thompson*, 128 Wn. App. 776, 790, 115 P.3d 1009 (2005). "Although courts routinely enforce such 'as is' clauses allocating the risk of *unknown*

defects to the buyers, to do so where the sellers *knew* about the defects and withheld material information would be to blindly enforce a contract of questionable provenance, obtained by fraudulent concealment." *Sloan*, 128 Wn. App. at 790.

Here, the PSA stated that the sale of the property was made on an "as is" and "with all faults" basis, and "without representations . . . of any kind." CP at 2273. However, because Redstone alleges that GF knew and failed to disclose certain defects, this language does not shield GF Capital from Redstone's fraudulent concealment claim. *Sloan*, 128 Wn. App. at 790. Accordingly, the "as is" clause does not bar Redstone's fraudulent concealment claim.

2. *PSA Release*

A party may release claims against another through contract. *See Hawkins v. EmpRes Healthcare Mgmt., LLC*, 193 Wn. App. 84, 93, 371 P.3d 84 (2016). Where general language in a release is followed by specific recitals, such recitals restrict the general language. *Hawkins*, 193 Wn. App at 96. Moreover, parties must clearly and affirmatively express their intent to release a fraud claim. *Hawkins*, 193 Wn. App. at 99. "At a minimum, if one party is to be held to release a claim for fraud in the execution of the release itself, the release should include a specific statement of exculpatory language referencing fraud." *Hawkins*, 193 Wn. App. at 99 (quotation marks omitted) (quoting *Living Designs, Inc. v. E.I DuPont de Nemours & Co.*, 431 F.3d 353, 371 (9th Cir. 2005)).

The PSA release stated that Redstone released any claims against GF Capital "based on breach of contract, breach of applicable law, strict liability, tort, or any other legal or equitable theory or basis of liability with respect to . . . the condition of the Property." CP at 2273. This specific language listing claims restricts the general language of the PSA release. *Hawkins*, 193

Wn. App at 96.  Although the PSA release states that Redstone released tort claims generally, the PSA did not include language specifically waiving fraud claims.  As a result, we hold that the PSA release does not preclude Redstone's fraudulent concealment claims.

B.      *PSA Amendment Release Does Not Preclude Fraudulent Concealment Claims*

GF Capital argues that because the PSA Amendment release specifically addressed claims arising from the BL Buildings' window deficiencies, Redstone's claims are barred.  We hold that there is a material question of fact on this issue.

The release in the PSA Amendment applied to "certain maintenance items identified in [the Property Condition E-mail]."  CP at 794.  The Property Condition E-mail detailed multiple deficiencies in the properties that were not identified in the offering memorandum.  The Property Condition E-mail noted that "291 window units" in the BL Buildings would need to be replaced. CP at 798.  Further, the Property Condition E-mail noted that "additional units" required resealing.  CP at 798.  Summarizing the deficiencies, the Property Condition E-mail listed the "Window System" as an additional repair cost of $235,000 not previously identified in the offering memorandum.  CP at 798.  The author of the Property Condition E-mail also stated, "Needless to say the window system and seals should have been regularly replaced and serviced to avoid the accumulated costs currently being faced."  CP at 798.

Here, the parties disagree about the terms "window units" and "window systems" within the Property Condition E-mail.  Br. of Appellant at 30; Br. of Resp't at 25.  The Property Condition E-mail uses both terms.  Also relevant to the parties' disagreement is Nanji's e-mail stating that the BL Building windows were failing, "not just the seals but the water ingress."  CP at 788.  Nanji testified that the water ingress he was referring to was not water intrusion into the

12

BL Buildings' windows generally, but rather the water into the double-paned glass that caused the window units to fog up and fail.

Redstone argues that the window deficiencies addressed in the Property Condition E-mail relate to the failed window units identified by Capitol Glass. These window units had failed because seals for the double-paned glass panels let moisture in between the panes of glass, which fogged up the windows. Redstone argues that this water ingress between the glass panels is the work priced in Capitol Glass's quotation. As a result, Redstone argues that this is the issue with the windows Nanji described. Redstone argues that the PSA Amendment did not include water intrusion or mold, rot, and decay that resulted from the break metal and failed seals of the overall window systems. As such, Redstone argues that the claimed defects were not part of the PSA Amendment release.

Conversely, GF Capital argues that it reduced the purchase price in exchange for Redstone's release of all claims regarding a broad interpretation of the term "window system." According to GF Capital, "window system" includes the seals, glaze, and break metal. In other words, "window system" refers to the window and surrounding frame. Based on this interpretation, GF Capital argues that Nanji's e-mail referencing the failing BL Buildings' windows, seals, and the ensuing "water ingress," shows that the window deficiency stated in the PSA Amendment was based on the water intrusion resulting from the failed window systems.

We hold that there is a material question of fact regarding which window deficiencies are covered by the PSA Amendment. Based on the Capitol Glass quote, Redstone's position that the PSA Amendment covers only the window units could be correct. Alternatively, GF Capital's position that the Property Condition E-mail purposefully used the "window system" to include

the entire window systems, not just the glazing, could be correct. This factual dispute cannot be resolved on summary judgment.

We hold that a question of material fact exists regarding what deficiencies were encompassed under the PSA Amendment release.

### III. FRAUDULENT CONCEALMENT

At oral argument, Redstone clarified that the allegedly concealed defect was "leakage at the area of the metal panels and at the window flashing."[5] Redstone argues that the trial court erred when granting summary judgment dismissal because GF Capital fraudulently concealed water intrusion that resulted in mold, rot, and decay. We hold that issues of material fact remain regarding water intrusion.

A.      *Fraudulent Concealment Legal Principles*

Fraudulent concealment occurs when (1) there is a concealed defect in the premises; (2) the seller had actual knowledge of the defect at the time of the sale; (3) the defect is dangerous to the property, health, or life of the buyer; (4) the buyer does not know of the defect; and (5) a careful, reasonable inspection of the premises by the buyer would not disclose the defect. *Obde v. Schlemeyer*, 56 Wn.2d 449, 452, 353 P.2d 672 (1960). Where the defect is apparent, a buyer cannot make a fraudulent concealment claim. *Stieneke v. Russi*, 145 Wn. App. 544, 561, 190 P.3d 60 (2008). "Once a buyer discovers evidence of a defect, they are on notice and have a duty to make further inquiries." *Douglas v. Visser*, 173 Wn. App. 823, 832, 295 P.3d 800 (2013). A

---

[5] Wash. Court of Appeals oral argument, *Redstone Black Lake 1, L.P. v. GF Capital Real Estate Fund-Investment I, LLC*, No. 51875-9-II (Sept. 19, 2019), at 2 min., 40 sec. (on file with court).

buyer cannot succeed even when the extent of the defect is much greater than anticipated. *Douglas*, 173 Wn. App. at 832.

The burden of proof for fraudulent concealment claims is clear, cogent, and convincing evidence. *Stieneke*, 145 Wn. App. at 561. When reviewing a case on summary judgment in which the standard of proof is clear, cogent, and convincing evidence, this court "'must view the evidence presented through the prism of the substantive evidentiary burden.'" *Woody v. Stapp*, 146 Wn. App. 16, 22, 189 P.3d 807 (2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). Thus, on summary judgment, we must determine, viewing the evidence in the light most favorable to Redstone, whether a rational trier of fact could find that it supported its fraudulent concealment claims with clear, cogent, and convincing evidence. *See Woody*, 146 Wn. App. at 22. In evaluating an order of summary judgment, we consider only the evidence and issues called to the attention of the trial court. RAP 9.12.

B.      *Material Issues of Fact Exist on Redstone's Fraudulent Concealment Claim*

Redstone argues that GF Capital fraudulently concealed that the BL Buildings experienced water intrusion from the break metal in the window systems. To prevail on this claim at trial, Redstone would have to prove that (1) there was water intrusion in the premises at the time of the sale; (2) GF Capital had actual knowledge of water intrusion at the time of the sale; (3) this condition is dangerous to property, health, or life; (4) Redstone did not know of the water intrusion at the time of the sale; and (5) a careful, reasonable inspection of the premises by Redstone would not have disclosed the condition.

15

GF Capital argues that the water intrusion was not concealed and Redstone had notice of water intrusion and knowledge of leaks, so this defect was known to Redstone. We hold that there are genuine issues of material fact regarding GF Capital's knowledge of water intrusion at the time of the sale, Redstone's knowledge of water intrusion through the break metal of the window systems, and whether a reasonable inspection would have revealed the water intrusion. Accordingly, we reverse summary judgment dismissal of Redstone's fraudulent concealment claim.

1.      *Concealed Water Intrusion Through Window System Break Metal Caused Dangerous Conditions*

The first and third elements are not at issue here. Redstone argues that water intrusion was a concealed defect at the time of the sale and that mold, rot, and decay caused by the water intrusion were dangerous to the BL Buildings. GF Capital does not contest that these elements were met.

2.      *GF Capital's Knowledge of the Water Intrusion*

Regarding the second element, Redstone argues that GF Capital knew about the water intrusion from the break metal at the time of the sale. We hold that an issue of material fact exists regarding GF Capital's knowledge of the water intrusion.

Before the parties completed the sale, GF Capital knew of repeated water intrusion issues in the buildings. At different times, Servpro and Passero worked to remediate water intrusion and the resulting mold or rot issues. However, Redstone submitted an affidavit from a certified industrial hygienist who pointed out the deficiencies in these remediation efforts. The hygienist stated that GF Capital should have opened up the walls to conduct water testing to determine the source of the leak. Instead, GF Capital merely removed moisture with humidifiers and cleaned

16

exposed surfaces. Additionally, Passero, one of GF Capital's subcontractors, covered up wet and rotten wood underneath the break metal at McKinley's direction. Further, before GF Capital put the BL Buildings on the market, McKinley proposed exterior repairs to prevent water intrusion. There is no evidence that GF Capital completed these repairs. Here, taking the evidence in a light most favorable to Redstone, there is a genuine issue of material fact as to whether GF Capital had knowledge of water intrusion at the time of the sale.

       3.      *Redstone's Knowledge of the Water Intrusion*

Regarding the fourth element, Redstone argues that it lacked knowledge of the water intrusion. We hold that there is an issue of material fact regarding Redstone's knowledge of water intrusion through the break metal of the window systems at the time of the sale.

During the due diligence period, Redstone hired two companies that performed inspections. Capitol Glass examined the windows of the BL Buildings. Capitol Glass provided a quote on recaulking and reglazing all of the windows and seals. In the quote, Capitol Glass stated, "Some of the break metal between the windows is coming off and the caulking has failed both buildings need to be checked out and fix the break metal, re seal it and or re anchored." CP at 724. During his deposition, Perry testified that the potential problem with break metal or failed caulking was water and moisture getting into the buildings.

Redstone also had Marx conduct an inspection of the BL Buildings. Marx's inspectors noted numerous issues with the windows and past signs of water intrusion. Regarding the buildings' windows, the report notes, "The various methods of installation and wet sealing suggest that there have been numerous repairs over the years due to water infiltration." CP at

773. Marx did not observe interior evidence of wall moisture, but stated that Redstone should periodically investigate for cracks and spalling to prevent water infiltration.

Here, neither report uncovered water intrusion from the break metal at the time of the sale. Redstone knew that the caulking and sealing around the windows was defective and that break metal between the windows was coming off. But, this knowledge is not the same as knowledge of water intrusion. Window systems can be structured with ribbon systems or other water redirection methods. These methods can prevent water from infiltrating the building cavity even when water gets through failed sealant or caulking. Taking the evidence in a light most favorable to Redstone, there is a question of material fact regarding whether Redstone knew about the water intrusion through the window system break metal at the time of the sale.

      4.      *Discovery of the Water Intrusion by a Careful, Reasonable Inspection*

Regarding the fifth element, Redstone argues that a reasonable inspection could not have revealed the water intrusion and resulting mold, rot, and decay. We hold that a question of material fact exists regarding the reasonableness of Redstone's inspection during the due diligence period.

Reasonableness is typically a question for the fact finder. *Old City Hall LLC v. Pierce County AIDS Found.*, 181 Wn. App. 1, 10, 329 P.3d 83 (2014). However, we can affirm a trial court's grant of summary judgment when no reasonable fact finder could find the conduct unreasonable. *Old City Hall*, 181 Wn. App. at 10.

Here, Redstone engaged Capitol Glass and Marx to inspect the properties.  Although these inspections alerted Redstone to past water intrusion, the due diligence period did not reveal evidence of present water intrusion.  However, an inspector from Plastering Plus stated that it was highly likely that the water damage, mold, and rot he discovered in October 2015 was present when the sale took place in April 2014.  Taking the evidence in a light most favorable to Redstone, there is an issue of material fact regarding whether a careful, reasonable inspection would have revealed water intrusion and the resulting the mold, rot, and decay.

GF Capital argues that this court should hold, as a matter of law, that a reasonable and careful inspection under the facts of this case necessarily would have included destructive testing.  This is because Redstone failed to exercise its right to conduct destructive testing, and GF Capital contends that this testing would have revealed the mold, rot, and decay which resulted from the water intrusion.  However, such an inquiry is for a fact finder to determine. We hold that the trial court erred when dismissing Redstone's fraudulent concealment claim because material issues of fact exist regarding GF Capital's knowledge of water intrusion at the time of the sale, Redstone's knowledge of water intrusion through the break metal of the window systems, and whether a reasonable inspection would have uncovered the defect.

V.  ATTORNEY FEES AT THE TRIAL COURT

Redstone argues that the trial court improperly awarded GF Capital attorney fees because the fraudulent concealment and negligent misrepresentation claims were not "on the contract." Br. of Appellant at 43.  On appeal, Redstone concedes that the breach of warranty claim is covered by the PSA fee provision.  However, Redstone argues that GF Capital did not properly segregate its fees from defending the breach of warranty claims from its fees from defending the

fraudulent concealment and negligent misrepresentation claims. Because we reverse the trial court's summary judgment dismissal of Redstone's fraudulent concealment claim, the attorney fees issue is not yet ripe, and we strike the trial court's order granting GF Capital's attorney fees award.

Here, the award of attorney fees depends on a determination of who prevailed. The PSA attorney fee provision states, "[I]f any action be commenced . . . to enforce any of the provisions of this Agreement . . . then the unsuccessful party therein shall pay all costs incurred by the prevailing party." CP at 2289.

Because we reverse the trial court's grant of summary judgment dismissal of the fraudulent concealment claim, a prevailing party is yet to be determined, and we remand to the trial court to strike the attorney fee award. The trial court's award of attorney fees was based on GF Capital successfully defending against all of Redstone's claims. However, our reversal of the trial court's summary judgment dismissal of Redstone's fraudulent concealment claim materially affects the trial court's determination. Accordingly, we remand to the trial court to strike the award of attorney fees and conduct further proceedings.

VI. ATTORNEY FEES ON APPEAL

On appeal, GF Capital requests attorney fees based on the PSA and RAP 18.1. For the reasons stated above, we decline to award GF Capital attorney fees on appeal.

We reverse the trial court's grant of summary judgment dismissal.

20

No. 51875-9-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, J.

We concur:

, A.C.J.

Lee, A.C.J.

Cruser, J.

21